**Gwyneth Y. HUGHES, Plaintiff,**

v.

**The CHESAPEAKE AND POTOMAC TELEPHONE COMPANY, Defendant.**

**Civ. A. No. 83–961.**

United States District Court, District of Columbia.

Dec. 21, 1983.

Robert L. Bell, Washington, D.C., for plaintiff.

Douglas J. McCollum, R. Michael Smith, Washington, D.C., for defendant.

## MEMORANDUM OPINION

JUNE L. GREEN, District Judge.

Plaintiff Gwyneth Y. Hughes, a black female, brought this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, and 42 U.S.C. § 1981,[1] alleging that her employer, Chesapeake and Potomac Telephone Company ("C & P") discriminated against her on the basis of her race by denying her an opportunity to take part in C & P's Mobility Application Plan, by denying her an opportunity to be transferred or reassigned to a position where she could do a combination of sitting, standing, and walking as recommended by C & P's Medical Department on September 2, 1981, and by forcing her to resign on October 19, 1981.

A trial was held in this matter on December 9, 12, and 13, 1983. The Court heard testimony from the following witnesses: Gwyneth Y. Hughes; Ruth Caul, Group Manager, Operator Services at C & P; Shirley Montes deOca, Assistant Staff Manager at C & P; Linda Spencer, Manager, Operator Services at C & P, and Richard H. Shelley, District Staff Manager in charge of the Universal Directory Assistance Office at C & P. The Court submitted the section 1981 claim to the jury which found in favor of plaintiff and awarded her $7,000 in damages.

After the jury was excused, defendant made a motion for judgment notwithstanding the verdict, pursuant to Rule 50 of the Federal Rules of Civil Procedure. The Court granted defendant's motion for judgment notwithstanding the verdict on plaintiff's section 1981 claim. Viewing the evidence in the light most favorable to plaintiff and giving her the advantage of every fair and reasonable inference justified by the evidence, *see, e.g., Metrocare v. Washington Metropolitan Area Transit Authority,* 679 F.2d 922, 924–25 (D.C.Cir. 1982), the Court found that only one reasonable conclusion could be drawn from the evidence, *i.e.,* that plaintiff was asked to resign or be terminated on October 19, 1981, not because of any racial animus on the part of C & P, but because of her unsatisfactory attendance record. The evidence does not show that C & P's actions with regard to plaintiff were motivated by purposeful race discrimination. *General Building Contractors Association v. Pennsylvania,* 458 U.S. 375, 390–91, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982). Because the evidence does not establish a claim under section 1981, the Court granted defendant's motion for judgment notwithstanding the verdict. The Court also ruled that plaintiff had failed to carry her burden of proof under Title VII.

## FINDINGS OF FACT

In September 1980, Ms. Hughes began working at C & P of Maryland as a Directory Assistance Operator on a computerized switchboard system. In November 1980, plaintiff transferred to C & P in Washington, D.C., and was employed as a Directory Assistance Operator in the Universal Directory Assistance Office until October 19, 1981. C & P is a New York corporation doing business in the District of Columbia as a public utility providing telecommunication services.

Plaintiff's supervisor during her tenure with C & P was Ms. Shirley Montes deOca, a white female. Ms. Linda Spencer, a white female, was plaintiff's second level

---

1. Plaintiff also asserted a claim under the D.C. Human Rights Act ("Act"), D.C.Code §§ 1–2544 and 2556 (1981 ed.). The Court dismissed plaintiff's claims under the Act because plaintiff did not commence this action within one year of the occurrence of the alleged unlawful discriminatory practice. *See* Memorandum Opinion at 2–3 (filed December 7, 1983).

supervisor and Mr. Richard H. Shelley, a white male, was her third level supervisor.

C & P has an attendance policy that applies to all of its employees. Under this policy, an employee absent from work for more than twelve days during a twelve-month period is rated "unsatisfactory" in attendance. Absences caused by illness are counted against an employee's attendance record even if the employee obtains a doctor's letter.

Between November 3, 1980, and October 19, 1981, plaintiff was absent from work a total of seventy and one-half days. Plaintiff was absent from February 2, 1981, to March 23, 1981, due to a flare-up of her back trouble. Plaintiff sustained a chronic back injury in an automobile accident in 1976. From March 23, 1981, to April 24, 1981, plaintiff worked part-time. She was charged with absences for the portions of the days she did not work full time or seven and one-half hours. Plaintiff also was absent from May 23, 1981, to June 29, 1981, due to an ectopic pregnancy, which required surgery. Finally, plaintiff was absent for two and one-half days in September 1981, and two days in October 1981.

C & P attempted to accommodate plaintiff's chronic back problems. When plaintiff returned to work part-time in March and April 1981, she was allowed to leave her operator's station and stretch for five minutes every hour. In May 1981, plaintiff was given a temporary position in Mr. Shelley's office where she performed clerical duties while his secretary was on vacation. Although this position enabled plaintiff to get up and move around more freely than did the operator's position, Mr. Shelley indicated that her performance was "mediocre." In late May, plaintiff began a second extended period of absence and did not return to work until late June 1981.

On July 7, 1981, Ms. Montes deOca put plaintiff on final warning because she had been absent from work for sixty-six days since November 1980. Plaintiff was advised that her attendance record was unsatisfactory and that she had to "improve or be suspended and or dismissed." Defend-

ant's Exhibit 11. During this meeting, plaintiff indicated that she understood she was on final warning.

In July 1981, C & P also compiled its "High Absence List." This list is compiled twice annually and indicates those employees that have unsatisfactory absence records. Plaintiff had the worst attendance record of any employee in Mr. Shelley's district. At that time, Mr. Shelley had supervisory authority over approximately 325 employees.

C & P's Medical Department conducted physical examinations of plaintiff on July 30, 1981, and September 1, 1981. Plaintiff's back problem was determined to be aggravated by the postural requirements of her job as an operator. On September 2, 1981, C & P's Medical Director, Dr. Siza I. Mekky, issued a report, indicating in pertinent part:

> It is the opinion of the Medical Dept. that Ms. Hughes be assigned a different job where she can do a combination of sitting, standing, and walking and be able to change positions as tolerated by her chronic ailment.

> The prognosis for the future absenteeism if she remains as an operator is uncertain. Physically she should not do prolong [sic] sitting.

Plaintiff's Exhibit 3.

After Mr. Shelley received this report, he notified the Reasonable Accommodations Committee, to see if they could find another position for plaintiff. This Committee is a branch of Personnel which attempts to find new positions for employees with poor records. In late September, Mr. Shelley was informed that the Committee could not arrange a transfer for plaintiff.

C & P also administers a program called the Mobility Application Plan ("M.A.P."). Under the M.A.P., employees are informed about career opportunities in the company and the necessary qualifications for specific positions. Any employee who wishes to learn about other jobs in the company may request such information from his or her immediate supervisor. Supervisors are re-

quired to furnish this information promptly. Plaintiff's Exhibit 20, Mobility Application Plan at ¶ 3.11. To be eligible for the M.A.P. program, an employee must be "performing in an entirely satisfactory manner in their present jobs." *Id.* at ¶ 2.0.

Between July 7, 1981, and October 19, 1981, Ms. Hughes was absent an additional four and one-half days. As a result, Mr. Shelley decided that Ms. Hughes should be offered the opportunity to resign or be terminated for unsatisfactory attendance. On October 19, 1981, Ms. Montes deOca, acting pursuant to Mr. Shelley's instructions, communicated that option to Ms. Hughes who decided to resign.

In 1980 and 1981, approximately sixteen out of the eighteen employees under Ms. Montes deOca's supervision were Black. During the same period, Ms. Spencer and Mr. Shelley had a similar percentage of Blacks in the employee complement that they supervised. Those percentages have remained substantially the same to date.

Plaintiff filed the instant action on April 1, 1983, alleging that C & P discriminated against her on the basis of her race.

### CONCLUSIONS OF LAW

The Court has jurisdiction of this matter pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, and 42 U.S.C. § 1981.

■ In a Title VII case, the plaintiff has the initial burden of proving by a preponderance of the evidence a *prima facie* case of racial discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).[2]

If plaintiff makes a *prima facie* case, the burden shifts to defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp. v. Green,* 411

U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). "[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. *See also United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1483, 75 L.Ed.2d 403 (1983). (Blackmun, J., joined by Brennan, J., concurring).

■ In the instant case, plaintiff alleges that she was discriminated against based on her race because she was qualified not only for continued employment with C & P but also for C & P's M.A.P. program. Despite these qualifications, she was terminated. To establish a *prima facie* case of racial discrimination, plaintiff must show that: (1) she belongs to a racial minority; (2) she was qualified for continued employment; (3) she was satisfying the normal requirements of her job; (4) she was terminated; and (5) other employees with comparable qualifications and work records who were not members of a racial minority were not terminated. *See McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 802 n. 13, 93 S.Ct. at 1824 n. 13; *Metrocare v. Washington Metropolitan Area Transit Authority,* 679 F.2d 922; *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1282 (7th Cir.1977); *cf. Valentino v. United States Postal Service,* 674 F.2d 56, 63 (D.C.Cir.1982) (discriminatory refusal to promote). Because no one replaced plaintiff when she was terminated, to make a *prima facie* case, plaintiff must show that non-minority employees with comparable records were not terminated. *Compare Powell v. Syracuse University,* 580 F.2d

---

2. The elements of a substantive claim of racial discrimination in employment brought under section 1981 parallel those claims brought under Title VII. *Rivera v. City of Wichita Falls,* 665 F.2d 531, 534 n. 4 (5th Cir.1982); *see also Metrocare v. Washington Metropolitan Area Transit Authority,* 679 F.2d at 925; *Pouncy v. Prudential Insurance Co. of America,* 668 F.2d 795, 797 n. 3 (5th Cir.1982). Accordingly, the Court's discussion of plaintiff's Title VII claim also will be applicable to plaintiff's section 1981 claim.

1150, 1156 (2d Cir.), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978) *with Bailey v. MCI Telecommunications Corp.,* 29 FEP Cases 1457, 1458 (D.D.C. 1982).

It is clear that plaintiff meets three of the elements necessary to make a *prima facie* case. She is a member of a racial minority, she was qualified for continued employment, at least as an operator, and she was terminated. Plaintiff, however, has not met the other two elements.

Plaintiff has not shown that she was satisfying the normal requirements of her job. "Some showing of satisfactory performance is necessary to raise an inference of discrimination in discharge of a racial minority member. ... Satisfactory performance is an ordinary prerequisite of continued employment ...." *Flowers v. Crouch-Walker Corp.,* 552 F.2d at 1282–83 (case citations omitted). The record indicates that plaintiff's attendance was "unsatisfactory." To be rated unsatisfactory, a C & P employee must be absent for twelve or more days during one year. When plaintiff was asked to resign or be terminated in October 1981, she had accumulated seventy and one-half absences.

Plaintiff argues that because she was absent on two separate occasions for extended periods of time, she should only be charged for "two incidents." This interpretation, however, does not comport with C & P's actual attendance policy under which employees are charged according to the number of days they are absent. It makes no difference that an employee may be absent for the same reason a consecutive number of days. The Court also notes that the record indicates that plaintiff was given a final warning in July 1981, at which time she had been absent sixty-six days. Ms. Montes deOca told plaintiff that she must improve her attendance or face suspension or dismissal. Defendant's Exhibit 11. Because satisfactory attendance is one of the normal requirements of plaintiff's job, and she missed over seventy days of work in less than a year, plaintiff has not shown that she was satisfying all of the normal requirements of her job.

Plaintiff also has not met the final requirement necessary to make a *prima facie* case. Plaintiff has not shown that other employees with similar work and attendance records, who were not members of a racial minority, were not terminated. Plaintiff was unable to identify any employee, regardless of race, who was similarly situated, *i.e.,* a short-term employee who had accumulated a substantial number of absences in one year, who had not been terminated.

Accordingly, the Court finds that plaintiff has not met its burden of establishing a *prima facie* case of racial discrimination by C & P.

Even assuming *arguendo* that plaintiff has made out a *prima facie* case, the Court finds that C & P has articulated a legitimate nondiscriminatory reason for its decision to give plaintiff the option of either resigning or being terminated on October 19, 1981.

Mr. Shelley testified that plaintiff had the worst attendance record in his division and was ranked first on the "High Absence List." Moreover, plaintiff was put on notice that her attendance was unsatisfactory on July 7, 1981. All of the C & P witnesses, Ruth Caul, Shirley Montes deOca, Linda Spencer, and Richard Shelley, indicated the importance of attendance for C & P employees and that an employee's performance evaluation is based partially on attendance.

Ms. Caul testified that in November 1980, when plaintiff began working at C & P in Washington, D.C., she was the Staff Assistant for the Centralized Training Center. In that capacity, she conducted an orientation program for all new employees. As part of the orientation program, she explained C & P's attendance policy, *i.e.,* that every employee is expected to work when they are on the schedule and that any absence is recorded, regardless of the reason.

Ms. Montes deOca testified that on November 13, 1980, plaintiff's first day at C & P in Washington, D.C., she discussed the attendance policy with plaintiff. Ms. Montes deOca testified that it was an office practice to discuss this policy with new employees because it is strict and C & P expects employees to be at work. She indicated that C & P rates employees on attendance according to the following scale: if an employee is not absent during a twelve-month period, he or she is rated "outstanding;" if an employee is absent one to six days, he or she is rated "satisfactory;" if an employee is absent seven to eleven days, he or she is rated "less than satisfactory;" and if an employee is absent twelve or more days, he or she is rated "unsatisfactory."

Ms. Montes deOca stated that evaluations of employees are based on three factors: quality of their work; quantity of the work they produce; and dependability, which includes their presence on the job. Employees are given formal evaluations or appraisals every six months based on their ratings over the preceding six months. Plaintiff was never given a formal evaluation because her absences precluded her supervisors from compiling enough information on her work. Ms. Spencer also indicated that no employees were given evaluations in January, February, and March 1981 because the Universal Directory Assistance Office in Washington, D.C. switched to a computerized system and the operators were being trained on the new system during this period.

Ms. Montes deOca did testify, however, that she filled out three "Operator Development Summaries" pertaining to plaintiff: on July 7, 1981; August 10, 1981; and September 17, 1981. Plaintiff's Exhibits 22, 23, 24. In all three summaries, plaintiff's courtesy and accuracy evaluations were excellent. Plaintiff's productivity evaluation, however, was unsatisfactory. Ms. Montes deOca testified that a productivity evaluation of ninety percent or less was unsatisfactory. Plaintiff was evaluated at eighty-seven percent productivity on July 7, 1981, seventy-five percent on August 10, 1981, and seventy-three percent on September 17, 1981.

Ms. Montes deOca also indicated that plaintiff never made a request or filed an application for a M.A.P. transfer and, in any event, plaintiff was not eligible for the program because she was unsatisfactory in dependability.

Ms. Spencer, Ms. Montes deOca's supervisor, testified as to the requirements for the M.A.P. program. She indicated that to be eligible for the M.A.P. program, an employee must be entirely satisfactory in quality, quantity, and dependability and must have held his or her present job for twelve months. Plaintiff contended that she was eligible for the program because even if she did not have twelve months of net credited service in her present assignment, an unusual condition existed, i.e., her medical condition, which should waive this requirement. Paragraph 3.21 of the M.A.P. states in pertinent part:

> An employee will be expected to have completed twelve months of net credited service in his present assignment before submitting a Mobility Application to be considered for another job. When an unusual condition exists, this requirement may be waived in individual cases with District Manager approval.

The Court, however, must give weight to paragraph 2.0 of the M.A.P. which states in pertinent part: "the Company will give consideration to applications for job mobility, as outlined below, from *employees who are performing in an entirely satisfactory manner in their present jobs.*" (Emphasis added.) It is evident from plaintiff's attendance records alone that she was not performing in an entirely satisfactory manner. Moreover, plaintiff's productivity ratings were consistently unsatisfactory. The Court also notes that the requirement in paragraph 2.0 of the M.A.P. that an employee be performing in an entirely satisfactory manner does not contain a waiver provision, unlike the twelve-month time-on-job requirement. Therefore, the Court finds that, even if the time-on-job require-

ment were waived, plaintiff was not eligible for the M.A.P. program because she was not performing in an entirely satisfactory manner.

Ms. Spencer also reiterated that pursuant to the C & P attendance policy, absences based on illness are chargeable against the employee, depending on the number of days the employee is absent. She testified that she did not know of any employees who had been absent for seventy days in twelve months who were not asked to resign. She did testify, however, that she was aware of employees with many years of service who had a large number of absences in a twelve-month period who were not asked to resign. She indicated that C & P takes the employee's past record into account when an employee incurs a large number of absences in a twelve-month period. If an employee's attendance has been satisfactory for a number of years, this is taken into account. Plaintiff, however, was a short-term employee who had never had a satisfactory attendance record.

Finally, Mr. Shelley was called as a witness and testified that he became aware of plaintiff in early 1981 because she was a short-term employee with a high number of absences. He discussed her situation with Dr. Siza I. Mekky, the Director of C & P's Medical Department. Although Mr. Shelley emphasized that the Medical Department could not order management to take its advice, it could recommend courses of action. In this instance, Dr. Mekky indicated that it would be helpful to plaintiff if she were able to stretch her back four to five minutes every hour. Mr. Shelley passed this advice on to Ms. Spencer. Plaintiff testified that after she returned to work in March 1981, she was allowed to get up and walk around every hour. The Court also notes that operators could stand, rather than sit, at their positions.

In a further attempt to accommodate plaintiff's back problems by allowing her more freedom of movement, Mr. Shelley arranged for plaintiff to take over some of his secretary's duties when she went on vacation in May 1981. He indicated, however, that her performance during this period was "mediocre" and that she had a tendency to disappear during working hours.

In late summer 1981, Mr. Shelley referred plaintiff to the Medical Department for an evaluation. On September 2, 1981, the Medical Department issued a report in which it recommended that plaintiff be assigned a different job so that she could avoid prolonged sitting. *See* Findings of Fact, *supra.* The Reasonable Accommodations Committee, however, was unable to find another position for plaintiff. *Id.*

Mr. Shelley testified that he decided to give plaintiff the option of resigning or of being terminated after he found out the Reasonable Accommodations Committee could not find another position for her and because she had accumulated additional absences after she was given a final warning in July 1981. Mr. Shelley decided on this course of action rather than merely suspending plaintiff because her attendance problems were based on a chronic back problem. He testified that suspension is used by C & P as a means of motivating employees. In this instance, however, suspension would not serve to motivate plaintiff because it would not alleviate her underlying back problem.

Based on the testimony of the witnesses for C & P and the evidence it submitted, the Court finds that defendant has established that it had a legitimate nondiscriminatory reason for its decision, *i.e.*, plaintiff was asked to resign or be terminated because her attendance was unsatisfactory under C & P's attendance policy.

Because defendant has articulated a valid reason for plaintiff's termination, plaintiff "must show that the reason so articulated or stated is a mere pretext of 'cover-up' for what was in truth a discriminatory purpose." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 (1st Cir.1979). Pretext may be shown by evidence that white employees with similar work and attendance records were not terminated or by C & P's "general policy and practice with respect to minority employment." *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. at 804–05, 93 S.Ct. at 1825. Statistics as to C & P's employment practices may be helpful in determining whether a general pattern of discrimination existed against blacks. *Id.* at 805, 93 S.Ct. at 1825. Plaintiff "must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision." *Id.* at 805, 93 S.Ct. at 1825.

In the instant case, plaintiff did not submit evidence that white employees with similar employment and attendance records were not terminated nor was she able to provide any evidence of racial animus towards her by C & P. *See Bailey v. MCI Telecommunications Corp.*, 29 FEP at 1459–60. Plaintiff was unable to point to any comments or specific actions by C & P management connoting racial bias.

Although plaintiff testified that she did not feel that her attendance was the reason she was asked to resign, the only "support" she was able to provide for her feelings was that the white employees talked and joked with the white supervisors; the white supervisors listened to suggestions of the white employees, but ignored plaintiff's suggestion regarding the positioning of the switchboard; plaintiff was made to feel inferior through non-verbal acts of the white supervisors; and plaintiff observed a white operator get up from her position and proceed to file and do office work. Plaintiff also indicated, however, that she did not know if the white operator she observed filing and doing office work was acting under management's instruction. In any event, the Court notes that this does not show pretext. A different situation might exist if plaintiff testified that white operators were allowed to leave their positions and do something that was not related to work or if white operators were given longer breaks or other preferential treatment. In this case, however, the white operator was observed filing and doing office work, clearly, business-related activities.

Plaintiff has not provided any tangible evidence of racial bias against her by anyone at C & P or that racial slurs were directed at her. *See Harris v. Group Health Association*, 662 F.2d 869, 872 (D.C.Cir.1981). The Court also notes that while plaintiff accuses Ms. Montes deOca of racial discrimination, Ms. Montes deOca consistently gave plaintiff high ratings on her courtesy and accuracy evaluations.

Finally, plaintiff has not provided the Court with statistical evidence that a general pattern of discrimination against blacks existed at C & P. Of the sixty to seventy operators under Ms. Spencer's indirect supervision, only six were white, the others were black. Of the four Group Managers that supervised at the time plaintiff was employed at C & P, two were black. These percentages have not changed significantly since that time. The statistics simply do not show a pattern of discrimination against blacks by C & P.

Therefore, the Court finds that plaintiff has not introduced any evidence that C & P's reason for asking plaintiff to resign, *i.e.*, her unsatisfactory attendance record, was a pretext for discrimination.

In accordance with the above, the Court finds that plaintiff has failed to establish a *prima facie* case of racial discrimination against C & P. Moreover, even if a *prima facie* case were established, plaintiff has failed to produce evidence showing that C & P's stated reason for seeking plaintiff's resignation or termination, *i.e.*, poor attendance, was a pretext for a racially motivated discharge. Therefore, the Court must enter judgment notwithstanding the verdict for defendant on the section 1981 claim and judgment for defendant on the Title VII claim.