**Raymond WILLIAMS, Plaintiff,**

v.

**Anthony M. FRANK, Postmaster General of the United States Postal Service, Defendant.**

**Civ. A. No. 88–0059–C.**

United States District Court, D. Massachusetts.

Feb. 21, 1991.

114

William Lafferty, Boston, Mass., for plaintiff.

M. Ellen Carpenter, Asst. U.S. Atty. (Peter W. Gallaudet, Office of Field Legal Services, U.S. Postal Service, of counsel), Windsor, Conn., for defendant.

## MEMORANDUM

CAFFREY, Senior District Judge.

Plaintiff, Raymond Williams ("Williams") was removed from his position as back-up window distribution clerk at the John F. Kennedy postal station in 1984. This Court previously affirmed a decision of the Merit Systems Protection Board ("MSPB") denying Williams' grievance in connection with the discharge. Defendant, Anthony M. Frank, postmaster general of the United States Postal Service, has now moved for summary judgment on Williams' claim that he was discriminated against in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Upon consideration, defendant's motion for summary judgment should be allowed.

### I.

The facts viewed in the light most favorable to the plaintiff are as follows. Williams received a career appointment with the Postal Service in 1970. In November, 1983, Williams bid on, and was awarded, the position of back-up window distribution clerk. Williams' duties as window clerk consisted of selling stamps and money orders. As part of his duties, Williams was issued a "stamp credit" of $4,500 which was kept in stamp drawers that he used while working at the window. A "stamp credit" consists of cash, stamps, blank money orders, stamped envelopes and other accountable items.

On December 22, 1983, Williams purchased a two hundred and fifty dollar money order from his own stamp credit. There was no evidence presented suggesting that such purchases are improper. Williams states that he left $250 and the money order receipt in an envelope for another

window clerk, Jim Cohen. Williams explains that he planned to mail the money order to his ex-wife to make a child support payment of $140. He states, however, that he mistakenly entered his ex-wife's name in the "purchaser" section of the money order, and placed his own name in the "payee" section. He did not then void the order, but cashed it at another branch instead. The Postal Service eventually processed this order, and, in the normal course of business, the Money Order Division in St. Louis, Missouri, discovered that the money order had never been accounted for with the appropriate forms, and that the receipt had never been received. Upon making this discovery, the Postal Service instituted an investigation which revealed that Williams had cashed the money order. Williams, when asked to explain, stated that the cash he set aside for Cohen must have gotten lost in the pre-Christmas rush. He also authorized the Postal Service to deduct fifty dollars from his paychecks until the money was repaid.

Subsequently, in a notice of proposed removal dated October 26, 1984, the Postal Service set forth the circumstances surrounding the money order incident, and charged Williams with failure to account for postal funds in the amount of $250, and with failure to account for his money order. The notice of proposed removal also stated that if the charges were sustained, the Postal Service would consider Williams' past record which included two five-day suspensions, both for being under the influence of an intoxicant at work, and two letters of warning. One of the letters of warning was for committing an unsafe work practice, and the second was for excessive absenteeism.

Williams filed a grievance as permitted by the American Postal Workers Union collective bargaining agreement. An arbitration panel denied his claim on July 15, 1985. Likewise, subsequent appeals to the regional and national offices of the MSPB were also denied. In addition, Williams filed a complaint with the Postal Service's Equal Employment Opportunity Office ("EEO"), alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964.

The EEO, finding no evidence of discrimination, dismissed this complaint. On November 18, 1988, 702 F.Supp. 14, this Court issued a memorandum and order granting defendant's motions for partial dismissal and for partial summary judgment on Williams' appeal of the MSPB decision. The case is currently before this Court on defendant's motion for summary judgment on the remaining Title VII claim.

II.

■ Defendant, Anthony M. Frank, has moved for summary judgment on the remaining claim. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). One way of meeting this burden is by showing that there is an absence of evidence to support the non-moving party's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54. Once the defendant has done so, the plaintiff in a discrimination suit, in order to survive a motion for summary judgment, must come forward with "names, dates, incidents, and supporting testimony—giving rise to an inference of discriminatory animus." *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 895 (1st Cir.1988).

■ It must always be remembered that on summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Likewise, in evaluating the evidence, a court must restrain itself from making its own judgments about credibility or truthfulness.

Caution is especially necessary in discrimination cases where the key issue is often motive and intent. *Lipsett*, 864 F.2d at 895. Despite the caution that a court must exercise, however, summary judgment is appropriate in discrimination cases where the non-moving party simply rests on "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990); *see Lipsett*, 864 F.2d at 895 (quoting *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 109–10 (1st Cir.1988)). In light of this standard, this Court shall examine Williams' claim against the defendant.

Williams' claim arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* A plaintiff need not demonstrate direct proof of discrimination in order to prevail on a Title VII claim. For cases where there is no "smoking gun," the Supreme Court has established a three-part analytical framework with which to evaluate Title VII claims.[1] *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *Oliver*, 846 F.2d at 107. Under the first step of this approach, the plaintiff must establish a *prima facie* case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824. After the plaintiff has made an initial showing, the employer must "articulate some legitimate, nondiscriminatory reason" for the employee's discharge. *Id.*

Once the employer has done so, the third step of the *McDonnell Douglas* approach requires the plaintiff to demonstrate that the employer's articulated reason is in fact a pretext for discrimination. *Id.* at 804, 93 S.Ct. at 1825.

Thus, under the framework established in *McDonnell Douglas*, it is Williams' burden to establish a *prima facie* case of racial discrimination. Williams must therefore show that: (1) he was within a protected class; (2) he was performing his job at a level that met the employer's legitimate expectations; (3) he was discharged; and (4) after his departure, his employer sought someone of equivalent qualifications to perform the same work after he left. *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 153 (1st Cir.1990); *Lipsett*, 864 F.2d at 899. Defendant argues that Williams has failed to meet the second requirement of the *prima facie* case, namely, that his job performance was adequate at the time he was discharged.[2] The defendant states that Williams' poor employment record, coupled with the money order incident, demonstrates that as a matter of law, Williams was not adequately performing his job. Alternatively, the defendant argues that even if it is assumed that the Postal Service did not rely on Williams' prior disciplinary record in deciding to terminate him, the money order incident alone demonstrates that Williams was not performing his job adequately.

---

**1.** The burden-shifting formula established in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), is not implicated in the case at hand, which is a circumstantial, rather than a direct evidence, case. *See Sabree v. United Bhd. of Carpenters and Joiners Local No. 33*, 921 F.2d 396, 404 (1st Cir.1990).

**2.** In his memorandum in support of the motion for summary judgment, defendant argues that Williams has not established a *prima facie* case because he failed to demonstrate that similarly situated employees were treated differently. Some courts view proof that similarly situated employees were treated differently as an alternative means of establishing a *prima facie* case. 3 A. Larsen & K. Larsen, *Employment Discrimination* § 86.40 (1990). Most courts, including the First Circuit, however, treat evidence of dis-

parate treatment as part of the plaintiff's demonstration that the employer's articulated reason for terminating the plaintiff is pretextual. *Id.; see, e.g., Morgan v. Massachusetts Gen. Hosp.*, 901 F.2d 186, 191 (1st Cir.1990) ("... it is possible for a plaintiff to demonstrate pretextuality by presenting evidence that ... non-black employees who were similarly situated were not discharged while the plaintiff was...."); *Gray v. New England Tel. and Tel. Co.*, 792 F.2d 251, 256 (1st Cir.1986) (court discusses lack of similarly situated employees in concluding that the plaintiff had not made a showing of pretext). Thus, a black plaintiff's inability to point to the different treatment allotted to similarly situated white employees does not defeat his case at the *prima facie* stage.

There is no disputing that Williams was not a model employee. Nonetheless, even considering Williams' checkered employment history, it could be found that until December, 1983, the time of the money order incident, Williams was meeting the Postal Service's legitimate expectations. In this regard, it is significant that Williams received both suspensions, and one letter of warning, *before* being awarded the position of window distribution clerk in November of 1983. Viewing the facts in the light most favorable to Williams as the non-moving party, it could reasonably be inferred that the Postal Service did not believe that the prior disciplinary actions impeded Williams' ability to perform the functions of a window clerk. Consequently, it would be inappropriate to conclude at this stage that the money order incident standing alone was sufficient to demonstrate Williams' inadequate performance of his duties, given the Postal Service's tolerance of other rule infractions. In addition, the money order incident is more logically viewed as a defense to be raised by the employer at the second stage of the *McDonnell Douglas* framework rather than an impediment to plaintiff's *prima facie* case. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 707 (3d Cir.1989) (insubordination is not something that plaintiff must disprove, but is more logically a defense raised at the second level to meet the *prima facie* case), *cert. denied,* —— U.S. ——, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990).[3]

■ In any case, it is unnecessary to dwell on the issue of whether a plaintiff has established a *prima facie* case where the employer has done all that is required of it under the second step of the *McDonnell Douglas* framework by articulating a legitimate, non-discriminatory reason for the discharge. *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *Morgan*, 901 F.2d at 189 (quoting *Aikens*, 460 U.S. at 715, 103 S.Ct. at 1481–82). In the instant case, the defendant has clearly met its burden of articulat-

ing a legitimate basis for its decision to discharge Williams, namely, the money order incident. The arbitration decision in favor of the Postal Service is more than enough to meet the defendant's burden of production at this stage of the *McDonnell Douglas* framework. *See Becton v. Detroit Terminal of Consol. Freightways*, 687 F.2d 140, 142 (6th Cir.1982) ("... an arbitration decision in favor of the employer is sufficient to carry the employer's burden of articulating 'some legitimate, non-discriminatory reason for the employee's rejection' "), *cert. denied,* 460 U.S. 1040, 103 S.Ct. 1432, 75 L.Ed.2d 791 (1983). The defendant's articulated reason thus dispels any presumption of discrimination created by the plaintiff's *prima facie* case. *Aikens*, 460 U.S. at 715, 103 S.Ct. at 1481–82; *Gray v. New England Tel. & Tel. Co.*, 792 F.2d 251, 254 (1st Cir.1986).

■ The presumption dispelled, the burden is then on Williams to demonstrate that the defendant's articulated, nondiscriminatory reason is a pretext concealing his racially discriminatory motivation. The more whimsical or idiosyncratic the reason for termination, the easier it is for a plaintiff to demonstrate pretext. *Gray*, 792 F.2d at 256 (quoting *Loeb v. Textron*, 600 F.2d 1003, 1012 n. 6 (1st Cir.1979)); *Meiri v. Dacon*, 759 F.2d 989, 997 n. 13 (2d Cir.) (quoting *Loeb*, 600 F.2d at 1012 n. 6)), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). Williams has fallen short of this burden.

■ In attempting to show pretext, Williams first disputes the Postal Service's articulated reason for firing him, arguing that he was merely negligent in failing to ensure that Cohen received the envelope containing the two hundred and fifty dollars. Under Article 28 of the collective bargaining agreement then in effect between the Postal Service and the American Postal Workers Union, AFL–CIO, he argues, window clerks are financially liable for any shortage due to negligence, but as

---

**3.** Put another way, it would be inappropriate to use the very act that is said to be discriminatory—the discharge over the failure to account for

the money order—to defeat the plaintiff's *prima facie* case.

a rule, are not discharged for such errors. It is settled law in the First Circuit that a plaintiff cannot make a showing of pretext simply by undercutting the employer's articulated reason for the discharge. *Morgan*, 901 F.2d at 191; *Dea v. Look*, 810 F.2d 12, 15 (1st Cir.1987); *Gray*, 792 F.2d at 255. The First Circuit has explained that it is not the employer's business judgment that is at issue, but rather, the employer's motivation. *Gray*, 792 F.2d at 255. Thus, in one case where the plaintiff had been fired for fighting, the First Circuit, quoting the district court, stated that " '[e]ven if [plaintiff] were able to demonstrate that the [defendant] mistakenly believed [plaintiff] was the aggressor and that, in discharging [plaintiff], the [defendant] acted on matters of purely private concern, these facts would not tend to show that *race* was a motivating factor in [plaintiff's] discharge.' " *Morgan*, 901 F.2d at 191 (emphasis in original) (summary judgment for defendant).

Thus, to demonstrate that there is a material question of fact regarding pretextuality, Williams must do more than merely undermine the defendant's articulated reason. Williams has several means of demonstrating that race was the motivating factor behind his discharge. First, plaintiff can show that similarly situated white employees were not discharged. *Morgan*, 901 F.2d at 191. A plaintiff may also produce statistics indicating a pattern of discriminatory discharges. *Medina–Munoz*, 896 F.2d at 10; *Cartagena v. Secretary of the Navy*, 618 F.2d 130, 136 (1st Cir.1980). Third, a plaintiff may point to instances of racial slurs or harassment. Fourth, the employer's prior treatment of plaintiff is relevant to a showing of pretext. *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 2378, 105 L.Ed.2d 132 (1989); *McDonnell Douglas Corp.*, 411 U.S. at 804, 93 S.Ct. at 1825; *Rossy v. Roche Prod., Inc.*, 880 F.2d 621, 625 (1st Cir.1989) (quoting *Patterson*, 109 S.Ct. at 2378).

The favored and most probative means of proving pretextual discharge is to demonstrate that similarly situated white employees were treated differently. *McDon-*

*nell Douglas Corp.*, 411 U.S. at 804, 93 S.Ct. at 1825 ("Especially relevant [to a showing of pretext] would be evidence that white employees involved in acts against petitioner of comparable seriousness ... were nevertheless retained or rehired."). In fact, "[i]t is boilerplate, in disparate treatment cases, that the absence of any showing that the plaintiff was treated differently from similarly situated employees requires a finding for the defendant." *Thomas v. Digital Equip. Corp.*, 702 F.Supp. 22, 25 (D.Mass.1988), *aff'd*, 880 F.2d 1486 (1st Cir.1989).

■ Williams has failed to show that by discharging him, the Postal Service treated him differently from similarly situated white employees. Williams points to two individuals whom he claims are similarly situated. The first is Charles A. Karavetsos, who was demoted from the position of manager of the Newton Center Branch, to general supervisor, for failure to discharge his duties as manager. Two employees are not similarly situated where their duties and responsibilities are not the same or at least comparable. *See Griffin v. Board of Regents of Regency Univ.*, 795 F.2d 1281, 1285 (7th Cir.1986) (not similarly situated where plaintiffs' responsibilities not similar); *Box v. A & P Tea Co.*, 772 F.2d 1372, 1379 (7th Cir.1985) (experienced, full-time cashier not similarly situated to new, part-time cashier; grant of summary judgment upheld), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986); *Cordova v. Harrah's Reno Hotel–Casino*, 707 F.Supp. 443, 446 (D.Nev.1988) (responsibilities of waitress and supervisor too dissimilar to be able to compare treatment). Clearly, there can be no comparison drawn between plaintiff, a window distribution clerk at the JFK facility, and Karavetsos who is not only a manager, but the manager of a branch at an entirely different location.

The second individual with whom Williams attempts to compare himself is Ralph Speigel, a white distribution clerk at the JFK postal station. Williams points to the fact that Speigel lost seven hundred dollars, and, although he was required to

pay back the shortage, was not discharged. Williams' comparison fails for two separate and independent reasons. First, and foremost, two employees are not similarly situated when the offense each is accused of is not the same. *Box*, 772 F.2d at 1379; *Boner v. Board of Comm'r of the Little Rock Mun. Water Works*, 674 F.2d 693, 697 (8th Cir.1982); *see Morgan v. Massachusetts Gen. Hosp.*, 901 F.2d 186, 191 (1st Cir. 1990). Williams attempts to argue that Speigel's seven hundred dollar shortage is comparable to his own negligence in misplacing the cash that he states he left in an envelope for Jim Cohen. In this regard, Williams places great weight in the fact that the removal letter used the phrase "failure to account," the same phrase used to describe cash shortages such as Speigel's.

Williams' attempt to have this Court blindly focus on the phrase "failure to account" is unavailing. The notice of proposed removal sets forth in great detail the facts surrounding Williams' procurement and cashing of the money order. Even taking Williams' explanation to be the truth, as we do for purposes of this motion, his situation is clearly different from that of Speigel, who simply could not explain the fund deficiency.[4] In this regard, it is significant to note that in the past, Williams had unexplained cash shortages, and like Speigel, had been required to make up for the shortage, indicating like treatment for like offenses. Williams might have an argument that he and Speigel were similarly situated if Williams had been charged merely with misplacing a money order which had then been cashed by a third party. Here, however, Williams' actions in filling out the money order, albeit accidentally, and cashing it after he realized his mistake, make the two instances vastly dissimilar from the Postal Service's point of view and from a legal standpoint.[5] *See Morgan*, 901 F.2d at 191 (plaintiff who

instigated fight and co-worker not similarly situated although both involved in same altercation).

The second reason that Williams cannot compare himself to Speigel is that employees are not similarly situated where their work records are not comparable. *See Shah v. General Elec. Co.*, 816 F.2d 264, 270 (6th Cir.1987) (other employees did not have similar work records, therefore not similarly situated; summary judgment for employer appropriate); *Pugh v. Heinrich*, 695 F.Supp. 533, 543 (M.D.Fla.1988) (defendant's motion for summary judgment granted where plaintiff produced no evidence of other employees with similar records of excessive sick days); *Williams v. Pepsi–Cola Bottling Group, Div. of Pepsico, Inc.*, 46 Fair Empl.Prac.Cas. 351, 354, 1987 WL 46868 (E.D.Wis.1987) (co-workers without similar "track record" not similarly situated). Williams suggests that his prior record is irrelevant because there is a material dispute as to whether the Postal Service actually relied on it in deciding to discharge him. Although Williams is entitled to have all reasonable inferences made in his favor, this Court need not close its eyes to unequivocal evidence. The notice of proposed removal sent to the defendant stated that "[i]n addition, the following elements of you [sic] past record will be considered at arriving at a decision if the charges are sustained," and then listed Williams' prior suspensions and letters of warning. Furthermore, the letter of decision stated that "[i]n reaching my decision, I have reviewed your entire case file with the utmost of care." That the money order incident was the motivating or precipitating factor behind his removal does not change the fact that Williams' prior record with the Postal Service was taken into consideration. There is no evidence that Speigel had any disciplinary problems and thus, for

---

4. Contrary to Williams' contention that the very act of investigating and disciplining him reflected racial animus, it should be noted that the Postal Service did in fact investigate Speigel's shortage, but found no evidence that would indicate wrongdoing.

5. This same reasoning regarding the type of offense applies to Karavestos, the manager of the Newton branch.

this second reason, he was not similarly situated.[6]

Just as Williams has failed to produce a similarly situated employee, likewise, he has produced no statistical support for his contention that his discharge was racially motivated. In a discharge case, relevant statistics would be ones that demonstrate that the Postal Service discharges black employees at a higher rate than whites. *Box,* 772 F.2d at 1379–80; *see Montana v. First Fed. Sav. and Loan Ass'n of Rochester,* 869 F.2d 100, 107 (2d Cir.1989). Williams has not even produced any evidence indicating the racial composition of the Postal Service or of the JFK facility in particular. The closest he comes to doing so is in his deposition where he states that there were no black supervisors, and that of "five or six" people who performed window service, he was the only one who was black. This "statistic" is neither shocking, nor does it have any bearing on the motivation behind his discharge.

Thus, plaintiff's entire showing of pretext rests on several instances which he alleges demonstrate racially motivated, unfavorable prior treatment by the Postal Service. First, Williams states that when he first came to the JFK station, he was given only two cash drawers, while the other distribution clerks, all of whom were white, received three.[7] He received a third drawer after filing a grievance with the American Postal Workers Union. Second, to show pretext, Williams notes that the manager of the JFK station, Mr. Brooks, had wrongly accused him of altering medical documents. Third, Williams says that the Postal Service's failure to pay him while he performed jury duty, although remedied by union involvement, is evidence of the discriminatory animus that led to his discharge. Again, the union resolved the matter. Finally, Williams complains that his co-workers, including his supervisors, mocked the way he spoke.

 None of these incidents supply the missing element of racial animus. First, it is clear from the plaintiff's own deposition testimony that his supervisors did not make jokes about his race, but rather, made fun of his southern accent.[8] Plaintiff's Southerness is not a protected trait. As to the other incidents Williams uses to show pretext, there is simply no evidence that race was a factor. Williams' unsubstantiated allegations that these incidents were somehow based on race are insufficient to show pretext. These actions on the part of Williams' supervisors might indicate racial animus if he was the only person against whom such treatment was aimed. *See Shah v. General Elec. Co.,* 816 F.2d at 271 (instances of poor treatment of

---

6. Williams also argues that the very act of instituting an investigation and disciplinary action itself shows that he was not treated the same as white employees. Williams thus argues that the Postal Service scrutinized him more than white employees and reacted more severely due to his race. This argument fails to raise a material question of fact for two reasons. First, it is clear from the decision of the MSPB that the Postal Service did in fact investigate Speigel's shortage. Second, the unaccounted for money order was not discovered as a result of the scrutiny of any of Williams' supervisors, but rather, was discovered by the Money Order Division in Missouri.

7. Defendant states that there were no drawers available when plaintiff first became a window distribution clerk.

8. The plaintiff's testimony was as follows:
"Q: Did [Brooks] ever refer to you as being a Southerner when he mocked you—
A: Well, what else could it be?
Q: —when he allegedly mocked you? Well, did he ever refer to you as being a Southerner?
A: No—oh, yes. Oh, yes. Oh, yes.
Q: He did?
A: A Southern accent, yes. Oh, yes. Where you from or whatever. You know.
Q: So is it fair to say that when he mocked you, he was mocking you because of your accent; is that correct?
A: What else? That's about it to me.
Q: And is that also true of the other supervisors that allegedly you [sic], Mr. Spizito—
A: Just made like—
Q: Let me finish my question. Mr. Spizito and Mr. Karavestos?
A: Mm-hm.
Q: Is it fair to say that, to your belief, for the reasons that they allegedly mocked you or your speech pattern was because of your Southern—
A: Yes.
Q: —drawl?
A: Yes, sir.
Q: Is that correct?
A: Yes." (Williams deposition at 160–61).

plaintiff not indicative of discrimination in the absence of evidence that others did not receive similar treatment; summary judgment granted); *Hughes v. Chesapeake and Potomac Tel. Co.*, 583 F.Supp. 66, 73 (D.D. C.1983) (same). Williams, however, has made no suggestion that he was the only window distribution clerk who had to go through his union to resolve problems at work. Even if Williams received poor treatment, Title VII does not protect against all poor treatment at the workplace, but only protects against discriminatory treatment.

Not only do these incidents fail to indicate racial bias, but they also have no nexus whatsoever with the discharge, the action upon which Williams brings this claim. *See White v. Westinghouse Elec. Co.*, 862 F.2d 56, 61 (3d Cir.1988) (comments about plaintiff's age concerned discrimination with respect to promotions not discharge); *Shah*, 816 F.2d at 271 (poor treatment while employed lacks sufficient connection with discharge). Certainly, evidence of a discriminatory atmosphere would be relevant to the contention that the discharge was a product of discrimination. *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir.1987). Here, however, the incidents complained of contain no indication of an atmosphere of racial bias. Considered in the light most favorable to Williams, this evidence does not raise an inference that the discharge was pretextual.

In reaching this decision, this Court does not take lightly its duty to view the facts in the light most favorable to the defendant. Nonetheless, in making all inferences in Williams' favor, we need not create facts. Williams has produced no evidence that similarly situated white employees received more lenient treatment, nor has he produced statistics or other evidence that the Postal Service has a pattern of discriminatory discharges. Likewise, he has demonstrated no evidence of racial slurs or harassment. In fact, Williams' showing of pretext rests solely on his disagreement with the defendant's reason for discharging him, and on several instances where he sought his union's help at work.

There is no dispute of material fact raised by Williams' speculations and unsupported allegations. *See Oliver*, 846 F.2d at 109–10; *Medina–Munoz*, 896 F.2d at 8.

For all of the reasons stated above, defendant's motion for summary judgment should be allowed.

Order accordingly.