# United States Court of Appeals
## For the First Circuit

No. 13-1609

JAMILYA PINA,

Plaintiff, Appellant,

v.

THE CHILDREN'S PLACE a/k/a THE CHILDREN'S PLACE
RETAIL STORES, INC. and JEAN RAYMOND,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Torruella, Howard, and Kayatta,
Circuit Judges.

Winston Kendall, with whom Law Office of W. Kendall, was on
brief for appellant.
Michael Mankes, with whom F. Arthur Jones II and Littler
Mendelson, P.C., were on brief for appellees.

January 27, 2014

**TORRUELLA, Circuit Judge.** Jamilya Pina ("Pina") appeals from the district court's grant of summary judgment in favor of her former employer, The Children's Place Retail Stores, Inc. ("TCP"), and TCP District Manager Jean Raymond ("Raymond"). Pursuing claims of employment discrimination and retaliation, Pina asserts that she was fired, harassed, and not rehired on the basis of race in violation of 42 U.S.C. § 1981 and Massachusetts General Laws chapter 151B, section 4. She argues that the district court abused its discretion by denying three of her discovery motions, and that it erred by granting Appellees' motion for summary judgment. Finding no error or abuse of discretion, we affirm.

## I. Background

Because Pina challenges the grant of Appellees' motion for summary judgment, we review the facts in a manner as favorable to Pina as the record allows, "keenly aware that we cannot accept conclusory allegations, improbable inferences, and unsupported speculation." Medina-Rivera v. MVM, Inc., 713 F.3d 132, 134 (1st Cir. 2013) (internal quotation marks omitted).

### A. Factual Background

Pina, an African-American woman, worked periodically as a per diem sales associate at TCP's South Shore Plaza store beginning in June 2006.[1] In late June or early July of 2007, Pina

_____

[1] We note here that the precise timing of events is not always clear from the record, wherein the parties periodically contradict themselves and each other in their various descriptions of dates.

applied for a position as an Assistant Store Manager ("ASM") at TCP's Cambridgeside Galleria ("Cambridgeside") location. Raymond -- TCP's white male District Manager -- interviewed Pina, and on July 2, 2007, he offered her the position. Pina accepted the ASM position and thereafter reported to the Cambridgeside Store Manager Ingrid Trench ("Trench"), an African-American female.

During this time, Pina was in a romantic relationship with Michael Williams ("Williams"), an African-American male who worked for TCP at the South Shore Plaza store. Pina, however, began to suspect that Williams was being unfaithful, and she accused multiple TCP employees of sleeping with Williams. Among those Pina suspected were two South Shore Plaza ASMs: Melody Mowatt ("Mowatt"), an African-American female, and Stephanie Giordano ("Giordano"), a white female.

On the night of July 20, 2007, Pina called the South Shore Plaza Store Manager Kristen Fernándes ("Fernándes") and accused Mowatt and Giordano of falsifying Williams's time cards. Pina asserts that while she was driving Williams to work, he told her that arriving late was not a problem because one of the ASMs would "take care of it." Because she continued receiving full child support payments from Williams even though she knew he was arriving late, Pina believed that Giordano and Mowatt were altering

_____

These differences are hardly material, however, and do not play a central role in our analysis.

-3-

Williams's time cards so that he was paid as if he had arrived on time.

According to her deposition testimony, Pina believes that she mentioned only the time card fraud and that she did not discuss any romantic relationships or allegations of sexual impropriety during her conversation with Fernándes. Pina also now claims that after telling Fernándes about the time card fraud, she made an additional report regarding Giordano's alteration of Williams's time cards by calling TCP's loss prevention hotline. Pina believed that she would be paid for her report because TCP's loss prevention program advertised rewards of up to $100 for hotline reports leading to the termination of an employee for theft.

The following day, on July 21, 2007, Fernándes reported Pina's call to Raymond, who responded immediately by investigating Pina's allegations. Raymond and Fernándes reviewed three weeks of time cards and questioned the ASMs at the South Shore Plaza store about the allegations, but they found no evidence of wrongdoing. Raymond then notified the Human Resources Director of his findings. Neither Raymond nor any other TCP employee interviewed Pina or informed her about the results of the investigation into the time cards.

Two days later, on July 23, 2007, Pina accused another TCP employee -- this time her own manager, Trench -- of having an affair with Williams. While at a Dunkin' Donuts before work, Pina

recognized one of the other patrons: Joe Leslie ("Leslie"), Trench's partner. In the presence of Trench's young daughter, Pina told Leslie that Trench was sleeping with Williams.[2] Leslie was shocked by Pina's statements and immediately informed Trench of the encounter. Trench then reported Pina's disparaging statements to Raymond, who immediately questioned Pina to get her version of events. Pina admitted to accusing Trench of sleeping with Williams as reported, although she argued that it was off the clock and none of Raymond's business. Raymond claims that he was shocked by Pina's use of foul language during their conversation, that he concluded Pina's actions were serious and inappropriate, and that he suspended her with pay pending further investigation.

Later that same day, Raymond went to the Cambridgeside store to inquire further about Pina's behavior. His investigation revealed that Pina had also told a Cambridgeside sales associate that Trench was sleeping with Williams, although Pina could not recall having that conversation. In addition, Raymond received a call from Mowatt, who revealed that Pina had left harassing messages on Mowatt's cell phone, accusing her of having an affair

---

[2] The parties dispute the precise language used by Pina during this encounter. Appellees contend that Pina said Trench was "fucking" Williams. Pina admits that she used words to the effect that Trench was sleeping with Williams, but during her sworn deposition she said she was unable to recall whether or not she used the word "fucking." On appeal, she now vigorously denies having used profanity.

with Williams as well.[3]  Fernándes and another TCP employee told Raymond that they had listened to Pina's messages and were concerned for Mowatt's safety.  Trench also told Raymond that she feared Pina.  Raymond determined that Pina had engaged in harassing, disorderly, and inappropriate behavior and that she could pose a threat to the safety of TCP employees.  After consulting with TCP's human resources department, Raymond fired Pina on July 27, 2007.

On January 10, 2008, Pina filed a charge of discrimination with the Massachusetts Commission against Discrimination ("MCAD"), alleging that TCP and Raymond terminated her employment on the basis of her race because they did not want to compensate her, an African-American woman, for reporting internal theft.[4]  On January 9, 2011, the MCAD dismissed Pina's charge, finding that she had engaged in a pattern of unprofessional behavior resulting in her termination.  The MCAD also found that six of the fourteen TCP employees to have received the $100 award for reporting theft from 2007 to 2008 were African-American, and

---

[3]  Pina admitted calling Mowatt to discuss her relationship with Williams, but she could not recall the substance of the conversation or whether or not she left any messages.

[4]  At her deposition, Pina testified that her MCAD statement that she was discriminated against because of her race was inaccurate, and that what she should have said was that she was terminated because TCP did not want to investigate an interracial relationship between Williams and Giordano.

that reporting internal theft was not protected activity that could give rise to a claim of retaliation under Massachusetts law.

Three months later, on April 2, 2011, Pina applied for a position as an ASM at TCP's Downtown Crossing location. Pina admits that she did not know if the store had any openings for that position at the time she applied. Believing that she missed a call from the Downtown Crossing store around May 12, 2011, Pina later returned to the store and spoke with the same TCP employee to whom she originally handed her application. Based on this conversation, Pina believed that the hiring manager would contact her. According to Appellees, however, there were no available ASM positions at the Downtown Crossing store at the time that Pina applied. Pina was never contacted or interviewed for the ASM position.

When an ASM position later opened up at the Downtown Crossing store in late April or early May 2011, Cynthia Henry ("Henry"), the District Manager responsible for the Downtown Crossing store, selected an internal candidate to fill the position. The candidate she selected was an African-American female with a year of experience as an ASM in TCP's Saugus store. Henry promoted her without considering any external candidates or advertising the position.

## B. Procedural Background

On June 14, 2011, Pina filed a second charge with the MCAD, this time claiming that TCP failed to interview and re-hire

-7-

her on the basis of race and in retaliation for her first MCAD charge, all in violation of Massachusetts law and Title VII. The MCAD eventually dismissed Pina's second charge, but prior to that decision, Pina initiated the present action on July 19, 2011. After the case was removed to district court, many of Pina's state law claims were dismissed for failure to file within the limitations period and failure to state a claim. On March 9, 2012, Appellees moved for summary judgment on Pina's remaining claims: supervisor harassment and discriminatory firing in violation of 42 U.S.C. § 1981, and retaliatory failure to rehire in violation of both § 1981 and chapter 151B of the Massachusetts General Laws. On March 27, Pina filed motions to reopen Raymond's deposition, to strike Henry's affidavit, for an extension of time, and for leave to file a cross-motion for summary judgment. After a hearing, the district court denied Pina's discovery-based motions, and on March 14, 2013, it granted Appellees' motion for summary judgment. After an unsuccessful motion for reconsideration, Pina's timely appeal followed.

## II. Analysis

On appeal, Pina argues that the district court erroneously denied three of her discovery-related motions: her motion to re-open Raymond's deposition, her motion to strike Henry's affidavit, and her motion for an extension of time. Additionally, Pina argues that the court erred by granting

-8-

Appellees' motion for summary judgment. We begin with Pina's discovery-based claims.

## A. Discovery motions

We review challenges to a district court's discovery determinations under an abuse of discretion standard. See, e.g., Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 859 (1st Cir. 2008). It is well settled that "[a]ppellate courts seldom intervene in discovery questions" and that "[t]he standard of review in discovery matters is not appellant-friendly." Id. at 860 (alteration in original) (quoting Modern Cont'l/Obayashi v. Occupational Safety & Health Review Comm'n, 196 F.3d 274, 281 (1st Cir. 1999)). Accordingly, we "will intervene in such matters only upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party." Id. (internal quotation marks omitted).

### 1. Motion to reopen Raymond's deposition

The district court originally imposed a deadline of December 16, 2011 for the completion of depositions. Pina allowed the deadline to lapse and then sought permission to amend her complaint to include a failure to rehire claim. The district court allowed the amendment and set a second deposition deadline of January 26, 2012. On January 24, 2012, Pina's counsel deposed Raymond in his capacity as a representative of TCP pursuant to

Federal Rule of Civil Procedure 30(b)(6).[5]  Subsequently, Raymond submitted a four-page errata sheet to correct and clarify his testimony pursuant to Federal Rule of Civil Procedure 30(e), which gives a deponent the opportunity to review a deposition transcript and, "if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them." Fed. R. Civ. P. 30(e)(1).  Pina argued that the changes to Raymond's deposition testimony were material and necessitated the reopening of his deposition, but the district court disagreed, giving rise to Pina's argument that the district court abused its discretion by denying her motion to reopen Raymond's deposition.

By way of support, Pina cites Tingley Sys., Inc. v. CSC Consulting, Inc., 152 F. Supp. 2d 95, 120 (D. Mass. 2001) for the proposition that a deposition may be reopened where "the changes contained in the errata sheets make the deposition incomplete or useless without further testimony."  Id. (internal quotation marks omitted).  Pina points to three changes in Raymond's testimony that she believes show that re-opening was required.[6]  In the first

_____

[5]  Federal Rule of Civil Procedure 30(b)(6) provides in relevant part that "a party may name as the deponent a . . . corporation . . . and must describe with reasonable particularity the matters for examination.  The [corporation] must then designate one or more . . . persons who consent to testify on its behalf . . . .  The persons designated must testify about information known or reasonably available to the [corporation]."  Fed. R. Civ. P. 30(b)(6).

[6]  Pina also correctly notes that a party served with a  proper Federal Rule of Civil Procedure 30(b)(6) notice must produce a

-10-

instance, Raymond changed his answer to a question regarding whether those reapplying with TCP are interviewed from "Yes, sometimes" to "Yes, when we have a qualified applicant and an open position."  Second, when asked whether the Associate Handbook or Code of Conduct stated that the punishment for disruptive and disorderly behavior was suspension and termination, Raymond originally said "I don't know."  His revised answer stated that "[u]nacceptable behavior may result in disciplinary action ranging from counseling sessions to immediate discharge as stated in our Associate Handbook."  Finally, Pina directs us to Raymond's testimony that Henry had called him saying that "she received this and didn't know what to make of it."  In response to the question "[d]idn't know what to make of what," Raymond originally said "[t]he allegation that she had applied for the assistant manager

witness who can testify as to facts known or available to the corporate deponent on the matters specified.  She then complains that Raymond was not prepared to discuss either vacancies at TCP stores to which Pina did not apply or what Pina herself said when reapplying, and that the district court was therefore required to strike his testimony as if he had not appeared.  Pina, however, never sought to preclude Raymond's testimony, neither area of inquiry was identified with reasonable particularity in the 30(b)(6) notice, and -- even if this Circuit elected to adopt a rule that a 30(b)(6) witness's severe unpreparedness could constitute constructive non-appearance -- Pina has fallen well short of showing constructive non-appearance in this case.  See Baker v. St. Paul Travelers Ins. Co., 670 F.3d 119, 124 (1st Cir. 2012) (declining to create a 30(b)(6) exception to the rule that "sanctions for non-appearance are only available when a deponent literally fails to show up for a deposition session" in a case where evidence of unpreparedness was limited) (internal quotation marks omitted) (emphasis added).  We need say no more on this subject.

position, and she had gone to MCAD."  Raymond's revised answer stated:

> She was confused.  She (Ms. Henry) had no idea Ms. Pina had applied for an Assistant Manager position at Downtown Crossing, which did not have an Assistant Manager opening, and she (Ms. Pina) was alleging discrimination or retaliation because she was not hired.  We did not have an Assistant Manager opening at Downtown Crossing.

Pina thus concludes that reopening was required since the changes were material, not "mere 'corrections' of stenographic errors," and because she needed to "explore the myriad inconsistencies" in Raymond's testimony.

In seeking to advance her argument, Pina has lost sight of the law.  Rule 30(e) does not limit a party to the correction of stenographic errors; it permits changes "in form <u>or substance</u>." Fed. R. Civ. P. 30(e)(emphasis added); <u>Glenwood Farms, Inc.</u> v. <u>Ivey</u>, 229 F.R.D. 34, 35 (D. Me. 2005) ("Changes in the substance of a deponent's testimony are contemplated by the rule.").  When witnesses makes substantive changes to their deposition testimony, the district court certainly has the discretion to order the depositions reopened so that the revised answers may be followed up on and the reasons for the corrections explored. <u>See Tingley</u>, 152 F. Supp. 2d at 121 (permitting reopening where revisions "materially alter[ed] the answers such as to render those portions of the deposition incomplete absent further testimony").  Here, though, Pina is unable to establish that the district court abused

-12-

that discretion. The changes at issue constituted clarifications or corrections consistent with Raymond's original testimony. For example, Raymond's original deposition testimony -- like his revised answers -- included statements to the effect that interviews would not be conducted absent job openings, that there were no available ASM positions at the Downtown Crossing store when Pina applied, and that the Associate Handbook prohibited Pina's behavior. In sum, any changes to Raymond's deposition testimony were either not substantive or were not material to the summary judgment motion. Accordingly, the district court acted well within its discretion in denying Pina's motion to reopen Raymond's deposition.

### 2. Motion to strike Henry's affidavit

Pina next argues that the district court erred by denying her motion to strike Henry's affidavit, which Appellees filed along with their motion for summary judgment after the close of discovery. Pina argues that Henry was not listed as a potential person with knowledge in Appellees' initial disclosures as required by Federal Rule of Civil Procedure 26(a)(1), which instructs parties to "provide to the other parties . . . the name . . . of each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A). Because Appellees did not disclose Henry's identity, Pina claims that she was unable to "test" Henry's

assertions via cross-examination at deposition.  Pina believes she was prejudiced as a result, and thus the district court abused its discretion when it denied her motion to strike Henry's affidavit.[7]

Pina's claims are unavailing.  First, the parties' initial disclosures preceded Pina's amendment of her complaint to include the retaliatory failure to rehire claim.  Thus, Appellees cannot be faulted for failing to list Henry before she became relevant to the case when the district court allowed Pina's amended complaint on January 5, 2012.

Second, although Pina argues that Appellees should have supplemented their disclosures to include Henry once she became relevant to the case, Federal Rule of Civil Procedure 26(e) exempts a party from the supplementation requirement where "the additional or corrective information has . . . otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1).  TCP first identified Henry as an individual relevant to Pina's failure to rehire claim on July 29,

_____

[7]  Pina also argues that Henry would have made a better 30(b)(6) witness than Raymond because Henry could have testified regarding the availability of ASM positions at other TCP stores and the conversations Pina had with TCP employees about her application. We have already disposed of Pina's claim that Raymond was an unprepared 30(b)(6) witness, see n.6, and Pina's argument that Henry had greater personal knowledge such that Appellees' selection of Raymond was sanctionable conduct similarly finds no basis in the law.  See Briddell v. St. Gobain Abrasives Inc., 233 F.R.D. 57, 60 (D. Mass. 2005) (observing that a 30(b)(6) witness may properly be expected to prepare to testify as to matters "beyond [those] personally known to that designee or to matters in which that designee was personally involved" (internal citations omitted)).

-14-

2011 in its MCAD position statement, which was signed and verified by Henry and stated that "[t]he decision to transfer [a TCP employee] into the open A[S]M position in [the Downtown Crossing store] was made by, among others, Cindy Henry, the district Manager for the Boston North District." Raymond likewise testified as to Henry's role in the hiring process during his deposition on January 24, 2012, two days prior to the close of discovery. The district court thus concluded that there was no discovery violation because Pina knew of Henry's role, at the very latest, on January 24, 2012, so the Rule 26(e) exception to the supplementation requirement applied.

Even assuming for a moment that we were inclined to view Appellees' failure to supplement their initial disclosures as a discovery violation, Pina has shown only that the district court could have stricken Henry's testimony, not that such a sanction was necessary in this case. Poulin v. Greer, 18 F.3d 979, 985 (1st Cir. 1994) ("[E]ven if defendants did commit a discovery violation, the district court could reasonably determine that plaintiffs did not suffer any prejudice, and, given defendants' plausible explanation for their failure to supplement, that any violation was not willful. The district court did not, therefore, abuse its discretion when it . . . allowed [the witness's] testimony."). In order to establish an abuse of discretion meriting reversal, Pina must show that she was "substantially prejudiced" by the district

court's "plainly wrong" discovery ruling.  <u>Curet-Velázquez</u> v. <u>ACEMLA de P.R., Inc.</u>, 656 F.3d 47, 55-56 (1st Cir. 2011) ("[T]he court's abuse of discretion must have resulted in prejudice to the complaining party." (internal quotation marks omitted)).  She is unable to meet this burden.

To show prejudice, Pina complains that she was unable to test the veracity of Henry's sworn assertions that she did not know of Pina's MCAD charge and that no ASM positions were available at the time of Pina's application.[8]  This argument falls well short of the mark.  As previously discussed, both statements appear not only in Raymond's deposition testimony from January 24th but also in the July 29, 2011 MCAD position statement that was signed and verified by Henry.  Pina's suggestion that she was surprised and prejudiced by the statements when they appeared for a third time in Henry's affidavit is thus disingenuous.  <u>Cf.</u> <u>Williams</u> v. <u>City of Boston</u>, CIV.A. 10-10131-PBS, 2012 WL 3260261, *4 (D. Mass. Aug. 7, 2012) (finding insufficient prejudice to merit exclusion where "[witness] was identified in police records as the victim" such that "the defendants knew of her existence, and knew that she was a key witness in the case").  Accordingly, the district court did not

---

[8]  Pina also argues that the district court improperly afforded weight and credibility to Henry's affidavit, but that claim is properly considered alongside Pina's other arguments that the court erred in granting summary judgment to Appellees.

abuse its discretion when it denied Pina's motion to strike Henry's affidavit.

### 3. Rule 56(d) motion

Pina's third and final discovery-related claim is that the district court abused its discretion when it denied as moot her Federal Rule of Civil Procedure 56(d) motion requesting additional time to respond to TCP's motion for summary judgment.[9]  By way of argument, Pina borrows heavily from her first two discovery-based claims; she claims that she needed additional time so that she might: 1) depose Raymond again subsequent to his filing of the errata sheet, and 2) "explore whether there was any veracity to the assertions in [Henry's] affidavit" by means of a deposition, due to Appellee's failure to supplement their initial disclosure list. Having already found that the district court acted well within its discretion in denying Pina's motion to reopen Raymond's deposition, we focus only on Pina's remaining claim: she needed more time to depose Henry.

Pina begins by correctly noting that district courts should liberally grant Rule 56 continuances where the Rule's preconditions for relief have been satisfied.  <u>Simas</u> v. <u>First Citizens' Fed. Credit Union</u>, 170 F.3d 37, 46 (1st Cir. 1999).

---

[9]  Pina refers to Federal Rule of Civil Procedure 56(f), but Rule 56(f) was redesignated Federal Rule of Civil Procedure 56(d) well before Pina filed her motion.  <u>See</u> Fed. R. Civ. P. 56(d).  We therefore refer to Rule 56(d) in our analysis for the sake of clarity.

Typically, a successful Rule 56(d) motion must: 1) be timely; 2) be authoritative; 3) show good cause for failure to discover the relevant facts earlier; 4) establish a plausible basis for believing that the specified facts probably exist, and 5) indicate how those facts will influence the outcome of summary judgment. See id. at 45 n.4; Resolution Trust Corp. v. N. Bridge Assocs., Inc., 22 F.3d 1198, 1203 (1st Cir. 1994). Pina argues that she filed her Rule 56 motion well in advance of the filing deadline for her opposition to summary judgment, that she asked for a reasonable extension of three weeks based upon Appellees' failure to supplement their initial disclosures, and that the extension was critical to the success of her case, so the district court's decision to deny her motion constituted an abuse of discretion.

As we have often observed, however, Rule 56(d) "is designed to minister to the vigilant, not to those who slumber upon perceptible rights." Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 45 (1st Cir. 1998) (internal quotation marks and alteration omitted). Although she now asserts vigilance in acting promptly after Appellees filed a motion for summary judgment, Rule 56(d) "requires due diligence both in pursuing discovery before the summary judgment initiative surfaces and in pursuing an extension of time thereafter." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 92 (1st Cir. 1996) (quoting Resolution Trust Corp., 22 F.3d at 1203). Pina does not dispute

-18-

the fact that she failed to request a single deposition prior to the court's initial deadline of December 16, 2011. Additionally, even ignoring the MCAD position statement and assuming Pina first learned of Henry during Raymond's deposition, Pina has offered no explanation for her failure to seek permission to depose Henry for over two months after that date.

More significantly, however, Pina's Rule 56 affidavit stated as the basis for the continuance that she sought to "examine Ms. Henry, under oath, to determine whether there is any veracity to these contentions or whether they were manufactured." Notably lacking from this speculation as to Henry's veracity is any plausible basis for the court to conclude that specified, material facts probably existed. "A 'Rule 56(f) affidavit [that] merely conjectures that something might be discovered but provides no realistic basis for believing that further discovery would disclose evidence' is insufficient to delay summary judgment." Mowbray v. Waste Mgmt. Holdings, Inc., 45 F. Supp. 2d 132, 143 (D. Mass. 1999) (alteration in original) (quoting Mattoon v. City of Pittsfield, 980 F.2d 1, 8 (1st Cir. 1992)); see also Rivera-Torres v. Rey-Hernández, 502 F.3d 7, 12 (1st Cir. 2007) ("Speculative conclusions, unanchored in facts, are not sufficient to ground a Rule 56(f) motion."). Pina's asserted desire to "explore" is perhaps more accurately characterized as a desire to "fish," and in either case, it falls well short of establishing entitlement to

-19-

Rule 56(d) relief. See Mowbray, 45 F. Supp. 2d at 143 (denying Rule 56(d) motion where movant "merely expressed a 'hope' or 'hunch' that unspecified facts might be found" because "[a]llowing a continuance in such a case would undermine the entire summary judgment procedure") (citation omitted).

The district court thus acted well within its discretion when it elected to deny Pina's Rule 56(d) motion.

## B. Summary Judgment

Having disposed of Pina's discovery-based claims, we turn now to her claim that the district court erred by granting Appellees' motion for summary judgment. We review a grant of summary judgment de novo, affirming only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Although we will draw all reasonable inferences in the nonmovant's favor, we will not "draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007). It bears repeating that genuine issues of material fact are "not the stuff of an opposing party's dreams," Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991), and a party cannot successfully oppose a

motion for summary judgment by resting "upon mere allegations or denials of his pleading," LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (internal quotation marks omitted). If a nonmovant bears the ultimate burden of proof on a given issue, she must present "definite, competent evidence" sufficient to establish the elements of her claim in order to survive a motion for summary judgment. Mesnick, 950 F.2d at 822. This is no less true in discrimination and retaliation cases where motive is at issue; a nonmovant cannot rely "merely upon conclusory allegations, improbable inferences, and unsupported speculation." Dennis, 549 F.3d at 855-56 (internal quotation marks omitted); Hoeppner v. Crotched Mountain Rehab. Ctr., Inc., 31 F.3d 9, 14 (1st Cir. 1994).

### 1. Discrimination

Where, as here, there is no direct evidence of discrimination, a plaintiff seeking to establish a prima facie case of race discrimination under § 1981 must successfully navigate the familiar McDonnell Douglas burden shifting framework. Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001). The burden of production starts with the plaintiff. In order to establish a prima facie case of discriminatory termination, a plaintiff must show: 1) she was a member of a protected class, 2) she was qualified for her position, 3) she was subjected to an adverse employment action, and 4) the position remained open or was filled by someone with similar qualifications. Id. Such a showing

creates a rebuttable presumption that the employer engaged in discrimination. This is not the end of the matter, however, and if the employer is able to articulate a legitimate, non-discriminatory reason for the termination, the presumption of discrimination disappears.[10] Id.; see also LeBlanc, 6 F.3d at 842. At the third and final stage of the McDonnell Douglas paradigm, the burden of production returns to the plaintiff, who must offer evidence that the defendant's explanation is pretextual and that discriminatory animus prompted the adverse action. Conward v. Cambridge Sch. Comm., 171 F.3d 12, 19 (1st Cir. 1999). The burden of persuasion remains on the plaintiff at all times. Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 221 (1st Cir. 2007).

In this case, the district court found that Pina failed to establish a prima facie case of race discrimination under § 1981 because she did not show that she was qualified for the position from which she was fired. The court went on to say that in any

---

[10] Additionally, the so-called "same actor inference" states that "[i]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." LeBlanc, 6 F.3d at 847 (quoting Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991)). The district court found that the inference applied in this case because Raymond both hired and fired Pina within the span of a month. Pina argues that the inference does not apply because Raymond did not act alone, firing her only after consulting with the human resources department. Although we find Pina's argument unpersuasive, we need not decide the matter because even without awarding Appellees the benefit of the same actor inference, as we will explain shortly, Pina's discriminatory termination claim still fails.

case, Pina presented no evidence to rebut the legitimate, nondiscriminatory reasons Appellees presented as the basis for her termination. The district court thus concluded that summary judgment was appropriate. Unsatisfied with this result, Pina lets loose a prodigious number of arguments on appeal, all of which -- as we will explain -- are meritless.

We begin with Pina's argument that she established a prima facie case of discrimination because, contrary to the district court's finding that she was not qualified for her position, she showed that she "was performing [her] job at a level that met the employer's legitimate expectations" at the time she was discharged. Williams v. Frank, 757 F. Supp. 112, 116 (D. Mass. 1991), aff'd, 959 F.2d 230 (1st Cir. 1992). We need not tarry here. Even assuming that Pina established a prima facie case of discrimination, her claim still fails because she cannot show that the nondiscriminatory explanation for her termination articulated by Appellees was pretextual cover for their true, discriminatory motive.

Appellees satisfied the second step of the McDonnell Douglas framework by producing competent evidence that Pina was terminated because she made inappropriate, unprofessional, and harassing statements to TCP employees that were disruptive and created safety concerns. Pina, while disputing the severity of the allegations, admits that she accused multiple TCP employees --

including her manager -- of having sex with Williams. She further admits to telling her manager's partner, in front of the couple's young child, that Trench was having sex with Williams. Raymond testified that multiple TCP employees reported concerns about Pina's behavior after these incidents, which prompted him to terminate Pina to ensure a safe environment for TCP's employees.

At this point, the burden shifted back to Pina to show that Appellees' explanation for her termination was mere pretext and that their true motive was discriminatory. To show pretext, a plaintiff may point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the asserted non-discriminatory reasons." Straughn, 250 F.3d at 42 (internal quotation marks omitted). Plaintiffs can use the same evidence to show both pretext and discriminatory motive, "'provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action.'" Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000) (quoting Thomas v. Eastman Kodak Co., 183 F.3d 38, 56 (1st Cir.1999)).

Pina claims that the complaints about her behavior are mere pretext and that she was fired because she reported misconduct that, if investigated, would have revealed an interracial

-24-

relationship between TCP employees that Appellees did not want to acknowledge. This, Pina concludes, constitutes a case of discriminatory termination,[11] and Appellees' non-discriminatory explanation for her firing should be ignored as mere pretext.

To put it mildly, the record does not bear out Pina's claims.[12] We begin by noting that Pina testified that she reported only time card theft, not the existence of an interracial relationship, to TCP. She offers not a single fact to support her allegation that the company knew of a romantic relationship, interracial or otherwise, between the employees Pina accused.[13]

---

[11] Notably, Pina does not claim that she was fired because of her race or because she engaged in or supported an interracial relationship. She reasons that because she reported the misconduct of, among others, a black male and white female, Appellees elected to fire Pina so that they would not have to investigate her report of an interracial couple's wrongdoing. Although we question whether Pina's unusual theory of discrimination could support a § 1981 claim even if properly supported, we need not reach that issue here, where Pina's claim clearly lacks the record support necessary to survive summary judgment.

[12] A number of Pina's arguments on appeal demonstrate at best a troubling disregard for the record and at worst an attempt to mislead this court. For just one example, consider her repeated argument that Appellees' explanation is unworthy of belief because Raymond "admitted that Ms. Trench and Ms. Pina had worked together for some time and that the former had never reported any fear of the latter." Raymond's actual testimony, however, stated that although Trench had not reported any fear of Pina prior to the Dunkin Donuts incident, on that day, she told Raymond that she feared Pina.

[13] When pressed on this point during her deposition, Pina merely repeated her unsupported assertion that although she did not report a sexual relationship between Giordano and Williams, "the company kn[e]w. They kn[e]w."

-25-

Undaunted, Pina forges onward to argue that two pieces of evidence show that Appellees' discriminatory feelings about interracial relationships motivated her termination: 1) Appellees violated company policy in both their failure to investigate her report and their decision to fire her, and 2) "white men do not like it when their women are dating black men."

We begin with the allegation of violations of company policy and procedure. In sum, Pina argues that Raymond failed to consider TCP policy when firing her and that her report of time card fraud was not investigated in accordance with TCP policy.[14] Pina correctly notes that Raymond was unable to find a written TCP policy during his deposition that stated that the use of profanity was prohibited behavior punishable with termination, but this fact does not give rise to a reasonable inference that Pina's termination violated TCP policy. Raymond's deposition testimony identified several provisions of TCP's Associate Handbook that he believed prohibited Pina's conduct, including the requirements that associates must be treated with dignity and respect and that unacceptable behavior, including disruptive or disorderly behavior

[14] Pina frequently repeats her accusation that TCP violated their own fair employment policy in firing her and that this is evidence of pretext and discrimination, but she offers only circular reasoning to support her claims. Her logic appears to be that her firing was an unfair product of racial discrimination, which is evidenced by the fact that her firing violated a company policy that discipline must be fair and not discriminatory. Neither repetition nor circular logic is sufficient to elevate this unsupported accusation to the level of competent evidence.

or insubordination, will not be tolerated. Although Pina argues that making disparaging comments about her coworkers and manager outside of work hours should not have been classified as disorderly or disruptive behavior as she understands the terms, the point is immaterial. "Courts may not sit as super personnel departments, assessing the merits-or even the rationality-of employers' nondiscriminatory business decisions." Mesnick, 950 F.2d at 825. Even if Raymond's understanding of "disorderly or disruptive" behavior was overbroad, there is nothing on the record to suggest that it was discriminatory, that he treated other employees who acted similarly to Pina in a different manner, or that he violated TCP policy when firing Pina.

We turn next to Pina's argument that Appellees' failure to investigate her theft report, as required by company policy, evidences a discriminatory motive. According to Pina, TCP policy dictated that reports of internal theft made to the company's designated hotline would be fully investigated, meaning that she would be interviewed, kept informed about the status of the investigation, compensated for her report, and shielded from retaliation. Appellees' failure to take these steps, she contends, shows that they were unwilling to fully investigate a report that would have revealed an interracial relationship, thus evidencing their discriminatory motive.

We cannot agree, as "to reach any such conclusion on this record, a juror would have to indulge impermissibly in unsupported speculation." LeBlanc, 6 F.3d at 846. As an initial matter, Pina admitted during her deposition that she could not recall making a hotline report, so her complaints that hotline procedures were not followed are difficult to comprehend, particularly in light of Raymond's deposition testimony that TCP records show no hotline calls from Pina.[15] See Arrington v. United States, 473 F.3d 329, 342-43 (D.C. Cir. 2006) ("While it is admittedly not the duty of district courts to weigh the credibility of the parties' testimony at the summary judgment stage, 'in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether . . . there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.'" (quoting Jeffreys v. City of New York, 426

_____

[15] Pina's initial MCAD affidavit claimed that she reported Mowatt, Giordano, and Williams to Fernándes on July 20, 2007, and that she later reported a fourth individual, a store manager, via the TCP hotline on the day that she was suspended. Pina's Amended Complaint, however, made no mention of a hotline call, and when she was asked during her deposition whether she actually made a call to the hotline, Pina conceded that she could not remember doing so or reporting a fourth person, and she could only recall reporting to Fernándes the alleged theft committed by Mowatt, Giordano, and Williams. In her appellate brief, Pina now claims that she did, in fact, make a hotline call, but not regarding a fourth person in a store manager position as she initially claimed. Instead, Pina now seems to assert that she made a hotline report regarding the time card theft by Giordano and Williams. How she came to this most recent view of events is unclear.

F.3d 549, 554 (2d Cir. 2005))). More significantly, undermining her frequent assertions that TCP failed to investigate her report is Pina's own admission during her deposition that she had no idea whether or not TCP investigated her report. She has given us no reason to doubt Raymond's testimony that he and Fernándes promptly and fully investigated Pina's report by reviewing three weeks of time cards and interviewing the accused, ultimately determining that there was no evidence to support Pina's claim of time card fraud and relaying that finding to human resources. On these facts, which show that Pina's claim was investigated, her theory that Appellees violated company policy and fired Pina because they did not want to investigate a report that would have revealed an interracial relationship finds no support.

Pina's final argument in support of her discrimination claim is that white men in both the past and present dislike interracial relationships between white women and black men. In Pina's view, the court should have taken judicial notice of this historical fact and denied summary judgment. At the risk of redundancy, we note again that "conjecture cannot take the place of proof in the summary judgment calculus." Bennett v. Saint-Gobain Corp., 507 F.3d 23, 31 (1st Cir. 2007); see also Kearney v. Town of Wareham, 316 F.3d 18, 22 (1st Cir. 2002) ("Creating a genuine issue of material fact requires hard proof rather than spongy rhetoric."). As the district court properly held, the historical

fact that many interracial couples have faced bias and prejudice is not evidence that Raymond or anyone at TCP harbored such discriminatory animus, and Pina's attribution of these discriminatory views to Appellees without any factual predicate or evidence to support her claim does not enable her to avoid summary judgment. See Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 190-91 (4th Cir. 2004) (affirming grant of summary judgment to employer where plaintiff relied primarily on references to the national history of racism to evidence employer's racial animus).[16]

Accordingly, because Pina was unable to rebut Appellees' legitimate, nondiscriminatory basis for her termination with evidence of pretext and discriminatory motive, the district court properly granted summary judgment to Appellees on Pina's claims of race discrimination.[17] To the extent that Pina purports to have

---

[16]  In an effort to dodge the swing of the summary judgment axe, Pina also proffers a mixed-motives theory of discrimination, arguing that she can prevail even if she shows that race discrimination was just one of a number of reasons for her termination. As we have just explained, however, Pina has failed to produce any evidence of discriminatory motive, so the mixed-motive theory cannot save her claim.

[17]  At the end of her brief, in a section titled "Supervisory Liability of Defendant Raymond," Pina largely repeats the discrimination claims we have now found inadequate to survive summary judgment. She adds only that Raymond can be held individually liable under § 1981 for subjecting her to retaliatory and "discriminatory harassment," apparently in a desire to advance a hostile work environment claim based on Raymond's failure to interview Pina about the theft report and his decision to suspend and terminate her. This underdeveloped claim is quickly disposed of by Pina's own deposition testimony, wherein she stated that she was not harassed while at TCP and that there was no immediate

-30-

articulated a separate claim against Raymond for breach of contract under § 1981 on precisely the same theory of race discrimination that we have now described and rejected, we note that this claim also necessarily fails. See Ayala-Gerena, 95 F.3d at 95 ("In order to prevail under Section 1981, a plaintiff must prove purposeful employment discrimination . . . .").

## 2. Retaliation

Pina's final claim on appeal is that the district court erred in finding that she failed to establish a prima facie case of retaliatory failure to hire in violation of § 1981 and Massachusetts General Laws, chapter 151, section 4.[18] Like Pina's discrimination claim, her retaliation claim is governed by the

---

reaction to her report of internal theft. Wary of beating the proverbial dead horse, we add only that Pina fails to so much as allege that her purported harassment was based on her race, and the facts she does allege fall well short of showing the severity, frequency, and pervasiveness of abuse necessary to allow a hostile work environment claim to survive summary judgment. See Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 73-74 (1st Cir. 2011).

[18] In a paragraph, Pina also asserts that she is not precluded from pursuing a claim for discriminatory failure to hire simply because TCP ultimately hired an African-American female for the position. While this is a true enough proposition, Pina has offered not one iota of evidence or argument to support a discriminatory failure to hire claim. Instead, she merely notes that she finds "suspicious" the fact that the selected candidate was, like herself, an African-American female. To the extent that Pina has not waived any potential discriminatory failure to hire claim by virtue of her failure to develop it, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."), we note that such rank speculation is entirely inadequate to prevent a grant of summary judgment in TCP's favor.

-31-

<u>McDonnell Douglas</u> burden shifting framework. <u>See</u> <u>Prescott</u> v. <u>Higgins</u>, 538 F.3d 32, 40 (1st Cir. 2008) ("The familiar <u>McDonnell Douglas</u> framework governs Title VII, 42 U.S.C. § 1981, and Massachusetts General Laws, chapter 151B claims." (referring to <u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. 792, 802-05 (1973))). Pina correctly notes that § 1981 encompasses retaliation claims. <u>CBOCS W., Inc.</u> v. <u>Humphries</u>, 553 U.S. 442, 457 (2008). To establish a prima facie case of retaliation under either § 1981 or Massachusetts General Laws, chapter 151B, section 4, a plaintiff must establish that: 1) she engaged in a statutorily protected activity, 2) she suffered an adverse employment action, and 3) the protected conduct and adverse employment action are causally connected. <u>Noviello</u> v. <u>City of Boston</u>, 398 F.3d 76, 88 (1st Cir. 2005); <u>Prescott</u>, 538 F.3d at 43. More specifically, in retaliatory failure to hire cases, a plaintiff seeking to pursue an adverse employment action must establish that: 1) she applied for a particular position, 2) the position was vacant, and 3) she was qualified for the position. <u>Vélez</u> v. <u>Janssen Ortho, LLC</u>, 467 F.3d 802, 807 (1st Cir. 2006).

The district court found that Appellees were entitled to summary judgment because Pina failed to establish a prima facie case of retaliation; she did not show that she applied for a vacant position, that she was qualified for the position to which she applied, or that Henry had any knowledge of her MCAD claim. Pina

disagrees, arguing that there was no evidence there were no vacancies, that she was qualified for an ASM position because she competently worked in that role before she was fired, and that Henry knew of her MCAD claim as a matter of law.

Pina's arguments defy both established legal precedent and logic. First, Pina bore the burden of establishing the existence of a vacant position; TCP was under no obligation to prove the non-existence of a vacancy. See id. at 807-08. Accordingly, Pina cannot credibly expect us to entertain her argument that Appellees' failure to prove that there were no vacancies in stores to which Pina did not apply somehow shows that she has satisfied her burden. Pina admitted that she had no knowledge of an ASM position vacancy at the time she applied for the position, and Appellees have testified that there was no vacancy until approximately one month after Pina applied, at which time an internal promotion was made and no external candidates were considered. Although Pina argues that TCP was obligated to consider her application for a position that opened weeks later, we need not address this contention. Even if Pina is correct, she nevertheless has failed to establish at least two additional elements necessary to make out a claim of retaliatory failure to hire.

First, Pina has not shown that she was qualified for the ASM position that she sought. The fact upon which Pina rests her

claim of qualification appears to be that during her one-month tenure as an ASM, she performed adequately before she was fired for inappropriate behavior. Appellees, however, have correctly pointed out that Pina's application clearly states that she desires an ASM position but is only available to work from 9:00 a.m. to 3:00 p.m. on Saturdays. According to TCP's Standard Operating Procedure regarding staffing, ASMs must be available open to close, including on weekends. Pina thus failed to qualify for the position even if one had been vacant at the time she applied.

Second, at the risk of piling on, we note that Pina has also failed to establish a causal connection between her protected conduct and the adverse employment action because she failed to show that Henry knew about the MCAD charge Pina filed three years prior. See Medina-Rivera, 713 F.3d at 139; Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 85 (1st Cir. 2006)("[T]here must be proof that the decisionmaker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action."). Pina argues that Henry had the requisite knowledge "as a matter of law" because Henry worked for TCP, which had opposed the MCAD charge Pina filed more than three year prior in relation to events at a different TCP store in a different district. She contends that the district court's finding to the contrary shows that the court engaged in making improper weight and credibility determinations.

It is well-settled that a judge must not engage in making credibility determinations or weighing the evidence at the summary judgment stage, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), but it is equally clear that judges cannot allow conjecture to substitute for the evidence necessary to survive summary judgment, Bennett, 507 F.3d at 31. Thus, the district court can hardly be faulted for failing to adopt Pina's speculative and unsupported assertion of Henry's knowledge of her MCAD charge. In the absence of any evidence that Henry or any other TCP employee involved in the ASM hiring decision had knowledge of Pina's protected activity, her retaliatory failure to hire claim fails. The district court properly granted summary judgment to Appellees as to Pina's retaliation claim in light of her failure to establish a prima facie case.[19]

---

[19] There is some suggestion in Pina's briefs that she believes that not only her MCAD complaint, but also her reporting of internal theft, constituted protected activity under § 1981 that can give rise to a retaliation claim. That § 1981 retaliation claims encompass at least some subset of activities beyond the reporting of direct racial discrimination is clear. See CBOCS W., Inc., 553 U.S. at 452, 455-56 (allowing a retaliation claim to proceed where plaintiff alleged he suffered retaliation for assisting another person to "secure his § 1981 rights"). However, Pina cites not a single authority to support her position that making an internal theft report in the hopes that an interracial couple would be fired so that she could collect company reward money constitutes "protected activity" under § 1981. Finding that Pina's perfunctory references to theft-report-based retaliation are unaccompanied by any developed argument, we deem them waived. Zannino, 895 F.2d at 17.

## III.  <u>Conclusion</u>

For the foregoing reasons, the district court judgment is affirmed and Pina's request for attorney's fees is denied.

**<u>Affirmed</u>.**