# United States Court of Appeals
## For the First Circuit

No. 19-1188

RIVER FARM REALTY TRUST; PAUL R. DERENSIS; LINDA DERENSIS,

Plaintiffs, Appellants,

v.

FARM FAMILY CASUALTY INSURANCE COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella, Lynch, and Kayatta,
Circuit Judges.

James T. Hargrove, with whom Brooks & DeRensis PC was on brief, for appellants.
William A. Schneider, with whom Morrison Mahoney LLP was on brief, for appellee.

November 19, 2019

**LYNCH**, **Circuit Judge**.  River Farm Realty Trust, Paul DeRensis, and Linda DeRensis ("River Farm") sued their home insurer, Farm Family Casualty Insurance Company ("FFI"), alleging breach of contract and violations of Massachusetts General Laws chapters 93A and 176D in how the insurer handled their claim for residential property damage.  The district court entered summary judgment for the insurer, concluding that, on this record, no reasonable jury could find that FFI violated chapter 176D or was in breach of the policy.  We affirm.

I.

A.   Facts

Because we are reviewing the grant of summary judgment, we take all inferences from the facts in favor of River Farm.  Carlson v. Univ. of New Eng., 899 F.3d 36, 43 (1st Cir. 2018).  We add that there are no material facts in dispute.

River Farm is a realty trust which holds title to 262 South Main Street in Sherborn, Massachusetts.  Paul and Linda DeRensis reside on this property.  In October 2014, FFI issued Special Farm Package "10" to River Farm Realty Trust for the policy period of November 15, 2014, to November 15, 2015.[1]

---

[1]     A separate policy, not at issue in this case, was issued to Paul DeRensis for the same policy period and provided coverage for personal property loss.

- 2 -

The policy provides that, in the event of a covered property loss, FFI would pay the least of the following:

> (a) the applicable limit of liability; (b) an amount not greater than [the insured's] interest in the property; (c) the cost of repairing or replacing the property with materials of equivalent kind and quality to the extent practicable; (d) the amount computed after applying the deductible or other limitation applicable to the loss; or (e) the ACTUAL CASH VALUE of the property at the time of loss (except as provided under the Replacement Cost Provision, if applicable).

The policy defines "actual cash value" as "the amount it would currently cost to repair or replace the covered property with new material of like kind and quality, less allowance for physical deterioration and depreciation, including obsolescence."[2] The liability limit under the policy was $1,263,807 in total, and $729,987 was the limit of liability for the River Farm residence at 262 South Main Street.

The policy also contained an amendment that was specific to Massachusetts. Under this amendment, the insured must provide the insurer with a "signed, sworn statement in proof of loss." That proof of loss triggers the obligation of the insurer, within thirty days of the insured submitting this statement, to "either

_____

[2] Because there were no such expenses, not at issue in this appeal is another policy provision that stated if the insured entity was a residence and became uninhabitable because of a covered loss, FFI would pay for living expenses for at most two years "for the necessary and reasonable increase in living costs [the insured] incur[s] to maintain the normal standard of living."

pay the amount for which it shall be liable, which amount if not agreed upon, shall be ascertained by award of referees . . . or replace the property with other of the same kind and goodness." If the insurer fails to comply with the policy within thirty days of receiving the statement of loss, it is liable for "the payment of interest to the [insured] at a rate of one percent over the prime interest rate on the agreed figure."

The Massachusetts amendment to the policy also allowed each of the insured and the insurer to seek a "Reference" if they disagreed as to the amount of loss. Massachusetts law requires insurance contracts to include this procedure. See Mass. Gen. Laws ch. 175, § 99.[3] The award selected by a majority of the referees "shall be conclusive and final upon the parties as to the amount of loss or damage."

In February 2015, ice dams formed at the River Farm property. Due to the thawing and refreezing of the ice dams through February and early March, water leaked into the residence. The DeRensises first contacted FFI by phone on an unspecified date around March 3, 2015, to notify it of the damage to the River Farm residence but kept no documentation of the call. FFI asserts that

---

[3] Under the Reference procedure, the parties refer the question of the amount of loss to "three disinterested men, [FFI] and [River Farm] each choosing one out of three persons to be named by the other." Those two referees choose a third referee.

- 4 -

it has no formal record of such a call but acknowledges that notice of damage to the residence was given.

On April 27, 2015, Paul DeRensis emailed FFI about a separate open claim that River Farm had filed with FFI. That same day, Paul DeRensis received an email from Mark Chilton, an adjuster from FFI who handled claims made by the DeRensises under different FFI policies.[4] The email stated:

> I must apologize. Unfortunately when your claims arrived at Farm Family they were set up as one singular claim where in fact there are two separate and distinct claims being asserted. Once I had recognized the issue of two claims and separated them a record keeping issue came to light. . . . [T]he independent claim numbers became interchanged. As you can see one minor issue led to a number of problems. . . . I will work to see you receive our coverage determination ASAP. Again, I apologize for the confusion and delay.

Within a week, on May 4, 2015, FFI assigned Scott Howard, a Senior Claim Representative, to the River Farm property damage claim. That same day, Howard sent Paul DeRensis a letter acknowledging receipt of the claim and asking Paul DeRensis to give him a call if he had any concerns. Also on the same day, Howard selected Dineley Claims Services, a Massachusetts adjustment company that he had used in the past, to handle the

---

[4] River Farm had several open claims with FFI. These other claims included a workmen's compensation claim, a tenant dispute, a claim referred to as "Arizona mistaken identity claim," and a claim referred to as "Donalds."

estimates needed.  Dineley Claims Services assigned adjuster Mark Whidden to the claim.  Howard told Paul DeRensis that FFI would be sending a representative to the property.

On May 20, 2015, Whidden inspected the residence in the presence of Paul DeRensis.  Whidden prepared an estimate[5] of the damage and mailed it to the DeRensises in June 2015.  Whidden estimated that the loss to the River Farm residence, less the deductible and depreciation, was $17,825.95.[6]  Both River Farm and the insurer were given a copy of this estimate.  The estimate included a statement that the adjuster had "reached an agreement of scope for the repairs with the insured as viewed at [the] inspection."

---

[5]    We use the term "estimate" to refer to a prepared report that determines the amount of money it will take to repair property loss.

[6]    Whidden's estimate broke down the loss by area of the residence and, within each area, itemized the repairs to be made and the costs to conduct those repairs.  The areas covered by the estimate were the roof, living room, kitchen, dining room, foyer, library, "Lindsay's bedroom," and "general" costs.  Within each area, the estimate listed up to twenty necessary repairs. Examples of such itemized repairs include removing and replacing insulation, removing and replacing drywall, removing and replacing cabinetry, removing and reinstalling appliances, removing and replacing wallpaper, removing and replacing crown moldings, painting, and construction clean-up costs.  The estimate also includes $1,365.87 for the application of mildewcide to the walls, ceiling, or both in the living room, kitchen, dining room, foyer, library, and "Lindsay's bedroom."  The estimate also included thirty-four photos of damage to the residence.

River Farm did not immediately notify the insurer or adjuster that it disputed this estimate in whole or in part. Nor did River Farm inform either the insurer or the insurer's appraiser that River Farm intended to contact contractors to get independent estimates. Neither the insurer nor its adjuster received any response to Whidden's estimate for close to five months.

On November 13, 2015, Linda DeRensis faxed a letter to Whidden, stating that the DeRensises had consulted with three local contractors, each of whom examined different aspects of the damage, and "discovered that the estimate [Whidden] provided [was] not consistent with local contractors' estimates." That letter contained estimates of a total loss of $154,769.93.[7] This letter was the first notice of any disagreement by River Farm as to the insurer's estimate of the recoverable loss.[8]

_____

[7] Attached to their letter requesting $154,769.93, the DeRensises included estimates as to different aspects of the damage from three local contractors. The first contractor document, from C&L Construction, contained an undated, itemized estimate that interior repair would cost $50,600. The second contractor, Mark E. O'Connell, gave a nonitemized estimate, dated November 5, 2015, for the cost of wallpaper and paint of $14,670. The third contractor, Bob Rogers Roofing, provided a nonitemized estimate, dated October 27, 2015, of repairs to the roof of $27,940. Bob Rogers Roofing also estimated that replacing rotten and damaged plywood may cost up to an additional $9,000, which the DeRensises added to the $27,940 figure in their request to FFI under the label of "roof repair." We note that River Farm's briefing does not ever discuss the itemization of the various estimates.

[8] In addition to the three estimates determined by contractors, the letter also sought additional costs including

- 7 -

The insureds do not allege that Howard ever told them to go hire these contractors. At deposition, Linda DeRensis stated that she had not invited either Whidden or Howard to the property to accompany the contractors.

It appears that Dineley Claims Services' records show receipt of the DeRensises' letter around November 16, 2015. When Whidden had not immediately replied to the letter, Linda DeRensis called Whidden on an unspecified date between November 13 and November 24.[9]

FFI received the November 13 letter on November 24 and Howard immediately attempted to contact the DeRensises. That same day, Howard emailed Paul DeRensis that (1) he had received the contractor estimates in the November 13 letter, (2) he had tried unsuccessfully to reach Paul DeRensis by phone earlier that day and left him voicemail messages, and (3) he requested a call to "see what we can do to get this resolved for you." Paul DeRensis replied by email on that same day stating:

---

over $42,000 for anticipated hotel costs and furniture damage. When these costs are removed, the sum sought was $112,134.93.

[9] River Farm's amended complaint asserts that Whidden "falsely" told the DeRensises that he never received the three estimates and that Whidden and Richard Dineley of Dineley Claims Services told them that they had already received payment for their claim. But River Farm did not depose Whidden or Dineley, nor did it provide any affidavits or other evidence about such statements. Regardless, it is clear that both Whidden and Dineley acknowledged the dispute and lack of payment by November 25, 2015, and River Farm does not argue it suffered any damages from this.

- 8 -

> Given how badly this claim handling has been botched, I am consulting an attorney this morning, not withstanding the requests from the adjuster to "start over" and forget the past. . . . Every contractor we had to on our own find to provide real estimates of this loss told us that the adjusters were not acting in good faith, and from recent conversations with them they present as basically scam men. . . . I understand that in Massachusetts we may be entitled to treble damages arising out of the bad faith botch up, plus legal fees, so your exposure is well over a half million and rising fast.

This was the first written notice to the insurer of any claim that its adjuster had acted in bad faith. Thereafter, the insurer communicated with River Farm's attorney. On November 24, Attorney James Hargrove emailed Howard to inform him that he would be representing the DeRensises and stated that he hoped to speak about the matter the following week.

On November 23, Linda DeRensis sent an email to Richard Dineley thanking him for taking her call, reiterating her dissatisfaction with Whidden, and stating that Whidden's estimate did not reflect the damage done to the River Farm residence. Within two days, at the request of Linda DeRensis, on November 25, 2015, Dineley assigned the DeRensises' claim to a new adjuster. On December 1, 2015, Dineley sent another email to Linda DeRensis asking her to contact an adjuster named "Paul." But then, on December 2, 2015, Dineley explained he had made a mistake and confused her claim with the claim of a different "Linda," and told

her that he had assigned Bryan Grandmont to the River Farm claim.[10] A few minutes later, Grandmont emailed Linda DeRensis that he was waiting for her attorney's contact information to proceed with the claim.

River Farm does not dispute that between November 24, 2015, and February 16, 2016, Attorney Hargrove corresponded with Howard, and vice versa, mostly via email and phone. The plaintiffs say that their claim was not resolved during this period from November to February because FFI asked them to get a new estimate of the loss to the River Farm residence.

---

[10] Dineley Claims Services' undisputed business records document the travel of the DeRensises' claim:
1. Receive claim 5/20/2015
2. [I]nsured answered phone on 5/25/2015 . . . Scheduled inspection date
3. [I]nspected loss 5/26/2015 with only Paul DeRensis present . . . Reached agreed scope.
4. [U]ploaded estimate/final report into portal 5/29/2015
5. [R]eceived phone call from the insured's wife on 11/23/2015 stating check was not received and black mold now present. Also claiming our estimate is not enough to make needed repairs. The insured stated no repairs have been made to date. Our photos taken on date of inspection shows the roof and siding to be very old. Only one shingle was found to be damaged. Interior showed small scattered areas of damage.
6. 11/23/2015 reviewed letter from insured and telephoned the insured three times with no answer.
7. File reopened/reassigned to local adjuster[.]

The emails reveal that on December 3, 2015, Attorney Hargrove told Howard that he was waiting on a new estimate from a local contractor. Howard replied the same day and told Attorney Hargrove to contact him whenever he was ready to discuss the claim. Howard and Attorney Hargrove then set up a phone conversation on December 4, 2015. On December 17, 2015, Howard emailed Attorney Hargrove to follow up on their phone conversation and to ask if the plaintiffs had received the new estimate. Attorney Hargrove responded via email the same day and stated that he had not yet received the estimate. Howard again followed up via email on January 29, 2016, to check on the status of the new estimate.

No new estimate was sent to Howard until February 16, 2016, when Attorney Hargrove emailed Howard a "preliminary statement of loss and associated estimates," which claimed the loss was $236,438.[11] This was a $81,668.07 increase over the insured's estimate of loss of $154,769.93 three months before.

That same day, Howard acknowledged receipt of the estimate and then contacted Attorney Hargrove on February 24, 2016, to set up a time to discuss the claim. Given the increase in the insured's estimate, FFI requested that its estimator

---

[11] This estimate was largely generated by a new contractor named Lincoln Barber. Barber compiled estimates from several other contractors that estimated the total cost to repair the residence would be $208,498. Also included with this request was the prior estimate of $27,940 to repair the roof.

- 11 -

reinspect the River Farm residence. On February 29, 2016, Howard confirmed that his independent adjuster, Grandmont, would be present at the second inspection.

The second inspection by the insurer's agent took place on March 2, 2016, within fifteen days of the date of Attorney Hargrove's new estimate. Present at this inspection were Howard, Grandmont, Linda DeRensis, Attorney Hargrove, and contractor Lincoln Barber.

On March 18, 2016, FFI received and sent to Attorney Hargrove Grandmont's new, increased estimate for FFI, which determined that the loss to River Farm (but not including the roof damage),[12] less the deductible and depreciation, was $28,005.21. FFI then issued payment to the DeRensises for $28,005.21. The DeRensises disagreed with this amount and on March 28, 2016, Attorney Hargrove sent a letter to Howard demanding Reference on behalf of the DeRensises pursuant to Massachusetts General Laws chapter 175, section 99.

The Reference proceeding, a two-day hearing, was conducted in June/July 2016. The insurer states, and River Farm

---

[12] The Grandmont estimate for FFI did not include any sum for roof repairs, nor did it purport to do so. The insurer explained that Grandmont was unable to inspect the roof because the DeRensises' roofing contractor had covered the roof with tarps and did not come out to remove the tarps before the inspection. The insurer offered to pay for the roofing contractor to come back to remove the tarps, but the DeRensises asked for a check before the work was done, and no check was issued.

does not dispute, that the parties agreed on a figure, not provided to us, for the roof repairs, and submitted that figure to the Reference Panel.[13]  Putting aside any sum for roof repairs, FFI requested that the referees find that Grandmont's inspection correctly determined the remaining amount of loss.  River Farm's requests to the Reference Panel changed over time.  On June 3, 2016, River Farm claimed that the building loss on an actual cash value basis was $240,173.45, but on June 27, 2016, River Farm increased its estimate to $257,997.97.

In its closing memorandum to the Reference Panel, the insurer provided its explanation for the varying estimates and demands over time:

> This was not a situation where the insureds disclosed information in a timely fashion sufficient to allow the insurance company to conduct a reasonable investigation based upon . . . all available information before having to address new claim material at Reference. Putting those issues aside, the view of the insured's residence in evidence did not support the insured's total building claim of $240,173.00 on a replacement cost basis.

On July 20, 2016, the Reference Panel determined that the "Building Replacement Cost Loss," including the roof, was

---

[13]     In its closing memorandum to the Reference Panel, the insurer further explained that a new roofer met with a contractor named Mark Dill of Bergeron Construction and the two agreed on the scope of loss to the roof.  For this reason, the insurer requested that the Panel disregard the plaintiffs' estimate from Bob Rogers Roofing.

$153,208 and the amount recoverable on an actual cash value basis was the lesser sum of $137,888.  On August 17, 2016, FFI paid the DeRensises the actual cash value amount determined by the Reference Panel less the amount already paid, for a total of $109,882.78.

On September 22, 2016, Attorney Hargrove wrote to FFI demanding payment of $147,397.77, which included legal fees, Reference expenses, and an "Additional Reference Award," based on alleged violations of Massachusetts General Laws chapters 93A and 176D.

FFI responded on October 21, 2016, and offered the DeRensises $7,766.58, which reflected six percent interest on the funds River Farm was unable to use during the course of the dispute.  FFI sought a signed release in return, but the DeRensises refused and the $7,766.58 was not paid to them.

In January 2017, the DeRensises sought[14] from the insurer a six-month extension of the two-year period under the policy to submit different claims for the cost of replacement to the residence and additional living expenses.  FFI declined.

B.   Procedural History of the Litigation

On November 23, 2016, River Farm filed an unverified complaint against FFI, alleging breach of contract and violations

---

[14]   The DeRensises did not allege that they incurred additional living expenses, nor did they submit any documents showing repairs made to the residence.

of chapters 93A and 176D.  We describe the allegations in the analysis below.

On June 8, 2017, FFI moved for summary judgment, supporting its motion with twenty-seven exhibits that documented the insurer's communications with the insureds throughout the dispute, the estimates of both FFI adjusters, the estimates from the plaintiffs' contractors, Dineley Claims Services' internal claim notes, the depositions of Scott Howard and Paul and Linda DeRensis, the plaintiffs' pre-hearing memoranda submitted to Reference, and the final Reference award.

River Farm opposed, relying on copies of the email and mail correspondence between FFI and River Farm, the depositions of Scott Howard and Paul and Linda DeRensis, the internal policies of FFI, claim notes from Dineley Claims Services employees, the two estimates from FFI, the plaintiffs' own estimates from November and February, portions of the materials submitted to the Reference Panel by both parties, and the Reference award.  River Farm did not depose anyone besides Howard.  Nor did it submit affidavits from the DeRensises, offer any evidence or argument as to insurance industry standards, or provide any evidence that what FFI did was in violation of any such standards.

The district court granted FFI's summary judgment motion on February 4, 2019.  <u>River Farm Realty Tr.</u> v. <u>Farm Family Cas.</u>

Ins. Co., 360 F. Supp. 3d 31, 46 (D. Mass. 2019).  River Farm timely appealed.

II.

We review the district court's grant of summary judgment de novo, taking the facts and drawing all reasonable inferences in the light most favorable to the nonmoving party.  Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As a federal court sitting in diversity, we apply Massachusetts law.  Mulder v. Kohl's Dep't Stores, Inc., 865 F.3d 17, 20 (1st Cir. 2017).

Massachusetts law is quite clear that summary judgment may be appropriately entered in insurance coverage disputes under chapter 176D.  See, e.g., Bobick v. U.S. Fid. & Guar. Co., 790 N.E.2d 653, 654 (Mass. 2003); Silva v. Steadfast Ins. Co., 35 N.E.3d 401, 408 (Mass. App. Ct. 2015).  It is also quite clear that the boundaries of what are viable claims under chapter 176D are matters of law for the court to decide.  See Silva, 35 N.E.3d at 408 (stating, in the context of assessing a grant of summary judgment to the insurer on the plaintiff's chapter 176D claim, that "the boundaries of what may qualify for consideration as a [G.L.] c. 93A violation is a question of law" (alteration in original) (quoting Chervin v. Travelers Ins. Co., 858 N.E.2d 746,

- 16 -

759 (Mass. 2006))). Summary judgment is appropriate where the insurer's actions fall outside those boundaries. See id. at 407-08.

A. Chapter 176D Claim

River Farm argues that the district court erred in concluding that no reasonable jury could find that FFI had violated Massachusetts General Laws chapter 176D. River Farm on appeal most heavily relies for its chapter 176D claim on two basic theories. It says a violation of chapter 176D is established by the amount of time which FFI took to resolve the claim from the first notice of a claim in March 2015 to the Reference award in July 2016. It also argues that such a violation is established by the disparity in amounts between FFI's estimates, River Farm's demand in November, and the final Reference award.

The pertinent state law, chapter 176D, section 3 states that "unfair claim settlement practices" constitute "unfair methods of competition and unfair or deceptive acts or practices in the business of insurance." Mass. Gen. Laws ch. 176D, § 3. Subsection 9 of section 3 lists fourteen acts or omissions that constitute "unfair claim settlement practice[s]." Id. § 3(9)(a)-(n). For a consumer plaintiff, a violation of chapter 176D, section 3(9) constitutes a violation of chapter 93A. See Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 917

(Mass. 1993).[15]  But a plaintiff engaged in "trade or commerce" may only use a violation of chapter 176D as evidence of a chapter 93A violation.  See id.  Like the district court, we treat this as a section 9 case, but do not think the result would be different under section 11.  This case is resolved on its particular facts, not on broad statements utilizing per se rules under Massachusetts chapter 176D law.

The central inquiry under chapter 176D is the reasonableness of the insurer's actions, regardless of whether the plaintiffs are consumers or engaged in trade or commerce.  See Bobick, 790 N.E.2d at 658.  "The standard for examining the adequacy of an insurer's response to a demand for relief under G.L. c. 93A, § 9(3) is 'whether, in the circumstances, and in light of the complainant's demands, the offer is reasonable.'"  Id.

---

[15]  The district court stated that the Supreme Judicial Court (SJC) decisions in this area show that chapter 176D should be read "narrowly," relying on Van Dyke v. St. Paul Fire & Marine Ins. Co., 448 N.E.2d 357, 362 (Mass. 1983), and Morrison v. Toys "R" Us, Inc., 806 N.E.2d 388, 393 (Mass. 2004).  We do not read these cases to support this statement.

River Farm argues that the district court relied on irrelevant case law because the relationship between River Farm and FFI was that of insured and insurer, not the more adversarial third-party-insurer relationship.  But the SJC has stated that both types of relationships are covered by chapter 176D.  See Clegg v. Butler, 676 N.E.2d 1134, 1139 (Mass. 1997).  Further, the case law that River Farm provided in support of this position at oral argument, Brandley v. U.S. Fid. & Guar. Co., 819 F. Supp. 101 (D. Mass. 1993), does not support this view and this opinion was subsequently withdrawn and vacated.

(quoting Clegg v. Butler, 676 N.E.2d 1134, 1140 (Mass. 1997)). Ordinarily, mere negligence by an insurer "does not represent an unfair or deceptive act." Boyle v. Zurich Am. Ins. Co., 36 N.E.3d 1229, 1241 (Mass. 2015). It may be that evidence of bad faith is also required. See Guity v. Commerce Ins. Co., 631 N.E.2d 75, 77-78 (Mass. App. Ct. 1994) ("An absence of good faith and the presence of extortionate tactics generally characterize the basis for a c. 93A--176D action based on unfair settlement practice."). Further, the SJC has rejected the proposition that an insurer must provide "evidence of insurance industry practices in similar circumstances and expert testimony" in order to prove that it acted reasonably. Bobick, 790 N.E.2d at 659.

The insureds' claims are paraphrases of the wording of several sections of chapter 176D, section 3, representing the two general themes outlined above.

1.  Length of Time to Resolution

We deal first with the insured's argument that FFI "fail[ed] to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies." Mass. Gen. Laws ch. 176D, § 3(9)(b). We break down the argument, as to the different periods of time.

As to the period of time between River Farm's report of the claim in early March and the reply from FFI on April 27, there is no evidence that this time period was unreasonable, and

certainly no evidence it occurred out of a desire to delay or bad faith. See Doe v. Liberty Mut. Ins. Co., 667 N.E.2d 1149, 1153 (Mass. 1996) (granting summary judgment to insurer on chapter 176D, section 3(9)(b) claim even though insurer failed to respond to plaintiff for six months in part because nothing in the record showed the delay was "the result of bad faith or ulterior motives"). FFI explained its delay in responding as a result of its confusion as to several outstanding claims, and then promptly sent an adjuster to the property. Even if there was negligence by FFI, negligence is not enough to show a chapter 176D violation. See Boyle, 36 N.E.3d at 1241.

We next look to the period between the first estimate by the insurer's agent in June 2015 and the response from the insureds in November and thereafter. The DeRensises did not inform FFI that they disagreed with the estimate or that they were seeking separate estimates as to the damage. Once the DeRensises sent the letter to the adjuster on November 13, FFI timely responded via email on November 24, the day FFI received the letter. From that date on, FFI regularly corresponded with the DeRensises' attorney by email and phone to get the matter resolved. FFI also complied with the Reference procedure once invoked. River Farm points to no evidence that FFI acted unreasonably in the time it took to respond.

We turn to River Farm's assertion that the insurer "fail[ed] to affirm or deny coverage of claims within a reasonable time after proof of loss statements [had] been completed." Mass. Gen. Laws ch. 176D, § 3(9)(e).[16] We see no evidence that the insurer denied coverage at any time. The dispute was about estimates of loss, not coverage, and as said above, FFI continuously was in touch with River Farm's attorney about the differences in estimated loss until River Farm invoked Reference in March 2016. No reasonable jury could conclude that FFI "fail[ed] to affirm or deny coverage of claims within a reasonable time." Id.

River Farm next argues that FFI "fail[ed] to effectuate prompt, fair and equitable settlements of claims in which liability ha[d] become reasonably clear." Mass. Gen. Laws ch. 176D, § 3(9)(f). We treat this as separate from the argument that the insurer's estimates of loss were unreasonably low, a topic to which we return. Massachusetts law is clear that there is no violation of chapter 176D where the insurer and insured had a "legitimate

---

[16] We bypass the fact that the insureds do not dispute that they never provided FFI with a sworn proof of loss statement. They instead argue that FFI waived this requirement and that the information River Farm provided to FFI in November 2015 serves as a substitute for a sworn proof of loss under Massachusetts General Laws chapter 175. See Mass. Gen. Laws ch. 175, § 102 (describing insurer's obligation if insured fails to provide sworn statement and insurer fails to request one). We need not reach this argument.

difference of opinion as to the extent of . . . liability." Bobick, 790 N.E.2d at 659; see also Silva, 35 N.E.3d at 408 (affirming summary judgment for insurer on chapter 176D, section 3(9)(f) claim because insured, rather than seeking to enforce a judgment in his favor or make a settlement request, appealed the judgment and so "open[ed] up both the scope of liability and the amount of damages").

Further, under Massachusetts law, "a duty to settle does not arise until 'liability has become reasonably clear' . . . and . . . liability encompasses both fault and damages." Clegg, 676 N.E.2d at 1140 (quoting Mass. Gen. Laws ch. 176D, § 3(9)(f)).

Although "excessive demands on the part of a claimant . . . do not relieve an insurer of its statutory duty to extend a prompt and equitable offer of settlement once liability and damages are reasonably clear," these excessive demands "may be considered as part of the over-all circumstances affecting the amount that would qualify as a reasonable offer in response." Bobick, 790 N.E.2d at 660-61.

The plaintiffs' own asserted estimates rose from $154,769.93 in November 2015, to $236,438 in February 2016, and to a demand of $257,997.97 in June 2016. And the sum finally awarded was $120,109.97 less than plaintiffs' last demand. The disparity between the award and the insurer's last estimate (plus an agreed-on sum for roof damage) was less than that. Here, as described,

- 22 -

the total amount of losses claimed by each side changed significantly over the course of the dispute, suggesting that each was reacting to changing information not necessarily discerned at the outset.

### 2. Discrepancy Between Various Estimates

We turn to the argument that the large disparities between FFI's June 2015 estimate, the plaintiffs' November 2015 demands, the insurer's second estimate in March 2016, and the final Reference award establish a chapter 176D violation. River Farm couches this in the terms that FFI "refus[ed] to pay claims without conducting a reasonable investigation based upon all available information." Mass. Gen. Laws ch. 176D, § 3(9)(d).

Disparity in amounts offered and amount awarded may, of course, be relevant, but cannot be subject to per se rules, and depends on the totality of the facts. The SJC has dealt with a variation of our own situation. In Bobick, the SJC affirmed the entry of summary judgment for the insurer on the plaintiff's chapter 176D claim where the disparity of $10,000 between the initial estimate and the award was "not substantially less than the amount ultimately determined by a jury to be the proper measure of damages" and there was no other evidence that the estimate was unreasonable. Bobick, 790 N.E.2d at 660. Significantly, the SJC nevertheless cautioned that the final award, in that case a jury

verdict, "may not constitute in all circumstances a definitive measure of reasonableness."  Id.

We also follow the SJC's statement that settlement negotiation within the range of reasonable positions is, "to an extent, a legitimate bargaining process" and "[e]xperienced negotiators do not make their final offer first off, and experienced negotiators do not expect it, or take seriously a representation that it is."  Id. (quoting Forcucci v. U.S. Fid. & Guar. Co., 11 F.3d 1, 2 (1st Cir. 1993)).

We first look to the large disparity between FFI's initial estimate of $17,825.95 for property damage in June 2015 and the Reference award of $137,888 some thirteen months later in July 2016.  The mere fact that the initial opening estimate, likely made before all the damage manifested itself, was less than what FFI later offered does not mean that it was outside the scope of reasonableness.  Each set of estimates, whether from the insurer or the insureds, at all times covered the same three basic areas of damage -- to residence interior, to paint, and to the roof (save for the express reservation as to the roof in the last insurer estimate).  Yet River Farm does not identify, by evidence or even argument, the ways in which FFI failed to act reasonably in estimating the damage.  Nor does it make any effort to show or argue that what the insurer did in any estimate varied from industry practice.  FFI's initial estimate is detailed and includes

- 24 -

specific statements of loss for particular rooms in the River Farm residence. River Farm provides no evidence or even argument as to which of these itemized estimated costs, if any, were unreasonable at the time made. At oral argument, when asked for such evidence, River Farm pointed us to its opposition to summary judgment. But that opposition does not contain greater specificity, nor any evidence other than the fact of different figures.

The passage of time between initial estimate and final award and the nature of the damage are also relevant. As the insurer sensibly points out, water and ice damage occurring over a New England winter may manifest itself more visibly and more broadly as time goes on and temperatures warm up.

The discrepancy argued by River Farm between the insured's $154,769.93 estimate in the November 13, 2015 letter, and Grandmont's $28,005.21 estimate in March 2016 also does not support a finding of unreasonableness. River Farm compares apples to oranges. First, the November 13 letter included close to $43,000 for anticipated hotel rental and for furniture damage, which concededly are not reimbursable as actual cost associated with property damage. Excluding those costs, this brings the insured's estimate down to $112,134.93, assuming in River Farm's favor that all the other items listed are recoverable. Of this amount, $36,940 was for roof damage. Second, Grandmont's estimate explicitly did not include, and reserved on, roof damage. If the

figure for the roof damage is excluded from the November 13 letter, then the $112,134.93 insured's demand is reduced to $75,194.93. The difference between this value and Grandmont's estimate is the much lower sum of $43,969.27.[17]

Finally, we look to the difference between FFI's second estimate of $28,005.21 in March 2016 and the final Reference award of $137,888, where the Reference award included an agreed-upon sum for the roof.[18] Again, River Farm compares apples to oranges. The Reference award contains a figure for the roof while the March 2016 estimate does not. The parties do not provide us with the agreed-upon sum for the roof, so we are unable to determine the true disparity between FFI's second estimate and the final Reference award. River Farm has provided no evidence, only argument, that the second estimate was unreasonable.[19] The insurer's agreement with the insured as to the amount of the roof

---

[17] Because the insured's requested sums are calculated on a replacement cost basis, we used Grandmont's replacement cost estimate, less the $500 deductible, of $31,225.66 in order to determine the difference between the two estimates.

[18] River Farm's only argument to the district court regarding the disparity between the $28,005.21 estimate and the Reference award was that it "is less than one-sixth of the Reference Award" and constituted a "lowball" offer. Any other arguments are waived.

[19] The second insurer March 2016 estimate includes a detailed report which lists the repairs needed in each damaged room of the residence. River Farm again does not tell us which parts of this estimate were unreasonable when made or point to any evidence as to why this is so.

damage and the submission of that agreed sum to the Reference Panel also diminish any argument as to unreasonableness.

On this record, this is insufficient to defeat summary judgment.

### 3.  Miscellaneous Arguments

In addition to its specific claims of error under chapter 176D, River Farm generally argues that FFI acted in bad faith.  As proof, River Farm points to FFI's refusal to grant it an extension to make additional claims for replacement costs and living expenses.  Even if the policy permitted recovery for these costs, FFI's decision not to waive the two-year time limit does not show an absence of good faith, especially when River Farm substantially contributed to the time periods involved.[20]

As to River Farm's general argument that the district court failed to view the facts in the light most favorable to River Farm because it failed to discuss various allegations made by River Farm, we reject this challenge.  A nonmovant cannot rely "merely upon conclusory allegations, improbable inferences, and unsupported speculation" to defeat summary judgment.  Pina v. Children's Place, 740 F.3d 785, 796 (1st Cir. 2014) (quoting Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 855-56 (1st Cir. 2008));

---

[20]  River Farm also says that FFI's proposal of $7,766.58 in response to the demand letter shows bad faith but does not develop this argument, so it is waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

see Haverty v. Comm'r of Corr., 776 N.E.2d 973, 985 (Mass. 2002) ("An adverse party may not manufacture disputes by conclusory factual assertions; such attempts to establish issues of fact are not sufficient to defeat summary judgment." (quoting Ng Bros. Constr., Inc. v. Cranney, 766 N.E.2d 864, 872 (Mass. 2002))). River Farm provides no evidentiary support for most of its allegations.

Finally, River Farm argues that it is entitled to a jury trial under Full Spectrum Software, Inc. v. Forte Automation Systems, Inc., 858 F.3d 666 (1st Cir. 2017). Even if there were such a jury trial right, this would not entitle River Farm to a jury trial absent a genuine dispute of material fact. See, e.g., Bobick, 790 N.E.2d at 654 (reversing appeals court's denial of summary judgment for insurer on chapter 176D claims). Further, Full Spectrum stated that "there is no precedent from our circuit that resolves whether the Seventh Amendment requires that a chapter 93A claim be tried to a jury in federal court," and concluded that it would "leave for another day a fuller consideration of the extent to which the Seventh Amendment may apply to chapter 93A claims." Full Spectrum, 858 F.3d at 678.

B.   Breach of Contract Claim

The entry of summary judgment on the breach of contract claim is easily affirmed. To show a breach of contract under Massachusetts law, a plaintiff "must demonstrate that there was an

agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 39 (Mass. 2016). The policy states that FFI must pay the least of five values, one of which is the "actual cash value" at the time of loss. If there is a dispute, the policy states that FFI shall comply with the Reference procedure. A dispute arose in November and once River Farm invoked the procedure, FFI complied and paid the actual cash value as determined by the referees. There was no breach of the contract.[21]

Because we have determined that FFI is not liable for breach of contract or a chapter 176D violation, we do not reach River Farm's arguments as to the appropriate amount of damages.

We do not say that the insurer FFI behaved admirably, and it may have been negligent at times. But liability under chapter 176D is not imposed for mere negligence and River Farm has simply failed to produce evidence in support of its assertions.

---

[21] River Farm has waived any argument based on the implied covenant of good faith and fair dealing because this argument was never raised to the district court and "arguments not made initially to the district court cannot be raised on appeal." DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 34 (1st Cir. 2001) (quoting St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp., 26 F.3d 1195, 1205 (1st Cir. 1994)). In any event, as our discussion makes clear, the claim is without merit.

<u>Affirmed</u>.  No costs are awarded.